MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel:   +1.415.442.1000
Fax:   +1.415.442.1001

Michael E. Kenneally, *pro hac vice*
michael.kenneally@morganlewis.com
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004-2541
Tel:   +1.202.739.3000
Fax:   +1.202.739.3001

Attorneys for Respondents
TWITTER INC., and X CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FABIEN HO CHING MA, LAILA AMLANI, JONATHAN WILLIS, MELISSA OLSON, SASHA SOLOMON, RYAN CROWLEY, GRAE KINDEL, SARAH ROSEN, and ADAM TREITLER,<br><br>Petitioners,<br><br>v.<br><br>TWITTER, INC., and X CORP.,<br><br>Respondents. | Case No. 4:23-cv-3301<br><br>**RESPONDENTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S MARCH 11, 2024 ORDER** |

**TABLE OF CONTENTS**

Page

I. The status of the putative class and its implications ............................................................. 1
II. The arbitration locations and venue provision ...................................................................... 3
III. Differences between the arbitration agreements ................................................................... 7
IV. Whether the JAMS and AAA determinations bind the Court. ............................................. 9
V. The requirements of applicable law ..................................................................................... 12

-i-   RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .................................................................................................... 6, 12

*Ansari v. Qwest Commc'ns Corp.*,
414 F.3d 1214 (10th Cir. 2005) ............................................................................................ 5

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
No. 06-cv-715, 2012 WL 3757486 (N.D. Cal. July 5, 2012) ................................................ 4, 7

*Bradford v. Rockwell Semiconductor Sys., Inc.*,
238 F.3d 549 (4th Cir. 2001) .............................................................................................. 13

*Brady v. Williams Cap. Grp., L.P.*,
928 N.E.2d 383 (N.Y. 2010) .......................................................................................... 12, 13

*Clark v. Renaissance W., LLC*,
307 P.3d 77 (Ariz. Ct. App. 2013) ....................................................................................... 12

*Cont'l Grain Co. v. Dant & Russell, Inc.*,
118 F.2d 967 (9th Cir. 1941) ...................................................................................... 3, 5, 6, 7

*Cornet v. Twitter, Inc.*,
No. 22-cv-6857, 2023 WL 187498 (Jan. 13, 2023) .............................................................. 3

*Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*,
529 U.S. 193 (2000) ............................................................................................................. 5

*Flora v. Prisma Labs, Inc.*,
No. 23-cv-680, 2023 WL 5061955 (N.D. Cal. Aug. 8, 2023) ............................................... 7

*Goobich v. Excelligence Learning Corp.*,
No. 19-cv-6771, 2020 WL 5593011 (N.D. Cal. Sept. 18, 2020) ...................................... 8, 14

*Green Tree Fin. Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000) ............................................................................................................. 12

*Hoyt v. WeLink Commc'ns, Inc.*,
No. 23-cv-287, 2024 WL 169671 (D. Ariz. Jan. 16, 2024) ................................................... 4

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ......................................................................................................... 4

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*,
363 F.3d 1010 (9th Cir. 2004) ..................................................................................... 4, 10, 11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*,
  49 F.3d 323 (7th Cir. 1995) .................................................................................... 5, 6

*Oracle America, Inc. v. Myriad Group A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ...................................................................................... 9

*Pope v. Sonatype, Inc.*,
  No. 15-cv-956, 2015 WL 2174033 (N.D. Cal. May 8, 2015) ...................................... 8

*Puri v. Golden Temple of Oregon, LLC*,
  No. 10-cv-882, 2010 WL 11595757 (C.D. Cal. June 9, 2010) .................................... 4

*Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*,
  973 F.2d 711 (9th Cir. 1992) ........................................................................................ 3

*Seaman v. Priv. Placement Cap. Notes II, LLC*,
  No. 16-cv-578, 2017 WL 1166336 (S.D. Cal. Mar. 29, 2017) ................................ 4, 7

*Shearson Lehman Bros. v. Brady*,
  783 F. Supp. 1490 (D. Mass. 1991) ............................................................................. 7

*Simplicity Int'l v. Genlabs Corp.*,
  No. 09-cv-6146, 2010 WL 11507526 (C.D. Cal. May 6, 2010) .............................. 4, 5

*Sovak v. Chugai Pharm. Co.*,
  289 F.3d 615 (9th Cir. 2002) ........................................................................................ 7

*Tarverdiyeva v. Coinbase, Inc.*,
  No. 22-cv-5468, 2022 WL 17995542, at *2 (N.D. Cal. Dec. 29, 2022) ...................... 3

*Textile Unlimited, Inc. v. A..BMH & Co.*,
  240 F.3d 781 (9th Cir. 2001) ............................................................................. *passim*

*Viking River Cruises, Inc. v. Moriana*,
  596 U.S. 639 (2022) ..................................................................................................... 4

*Weber v. X Corp.*,
  No. 23-cv-233, 2024 WL 470255 (E.D. Wash. Jan. 8, 2024) .................................. 2, 3

**Statutes**

9 U.S.C. § 2 .......................................................................................................................... 12

9 U.S.C. § 4 ................................................................................................................ *passim*

9 U.S.C. § 9 ............................................................................................................................ 5

9 U.S.C. §§ 10-11 .................................................................................................................. 5

Federal Arbitration Act ........................................................................................... 4, 11, 12

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

**Other Authorities**

AAA, *Employment Arbitration Rules and Mediation Procedures* (2017).................................... 8

JAMS, *Employment Arbitration Rules & Procedures* (June 1, 2021) ..................................... 9, 13

*Oxford English Dictionary* 579 (2d ed. 1989) ............................................................................. 13

*Webster's New International Dictionary* 132 (2d ed. 1955).......................................................... 13

Respondents submit this brief in response to the Court's March 11, 2024 Order (Dkt. 41) requiring supplemental briefing on five questions.

## I. THE STATUS OF THE PUTATIVE CLASS AND ITS IMPLICATIONS

The Court first asks: "Does the putative class in this case include any individuals against whom Twitter has successfully moved to compel arbitration in other cases? If so, how, if at all, does that impact the Court's consideration of the motion?" Order 1.

The scope of the putative class(es) is unclear. Petitioners have not yet filed any motion for class certification and the putative class definitions in their various filings have changed. In their Amended Petition (Dkt. 6), Petitioners assert that they "bring[] this Petition to Compel Arbitration as a Rule 23 class action on behalf of all former Twitter employees throughout the United States who have filed demands for arbitration against Twitter, but for whom Twitter has refused to proceed with arbitrating their claims." Am. Pet. ¶ 17; *see also id.* ¶ 30 ("[o]n behalf of themselves and other Twitter employees with whom Twitter has entered arbitration agreements but has refused to participate in arbitration"); *see also* Dkt. 7 (Mem. of Points & Authorities) at 1.

Based upon this definition, the putative class does *not* contain any individuals against whom Twitter has successfully moved to compel arbitration in other cases—and, indeed, the putative class is a null set—because Twitter has not refused to proceed with arbitrating the claims of any employee who agreed to and did not opt out of a Dispute Resolution Agreement ("DRA"). In those jurisdictions in which fee-sharing is lawful, Twitter has simply insisted on following the terms of its DRA and is ready, willing and able to proceed with and participate in arbitration consistent with such terms (and, correspondingly, will not proceed subject to the JAMS Minimum Standards and the AAA proposal for a process arbitrator because each such option conflicts with the terms of the DRA). *See* Dkt. 35 (Twitter Opp.) at 4-5. Insisting on adherence to the DRA terms does not constitute refusing to arbitrate. Indeed, Twitter proposed advancing Claimants' portion of the initial arbitral fees in order to enable the AAA arbitrations to move forward—on the condition that Claimants, in turn, would let the arbitrators decide on fee-sharing allocation and/or reimbursement issues and agree to comply with those arbitrators' decisions. *Id.* at 5; Dkt. 36 (Meckley Decl.), Ex.

1    3, at 3. Twitter stands behind that offer.[1] If anything, it is Claimants—not Twitter—who have
2    refused to arbitrate in accordance with the DRA by refusing to proceed under that proposal. Thus,
3    based on the putative class definition in the Amended Petition, the answer to the Court's first
4    question is "none."

5    The putative class defined in Petitioners' original (and presumably superseded) Petition to
6    Compel Arbitration (Dkt. 1) includes "all former Twitter employees throughout the United States
7    who have filed demands for arbitration against Twitter with JAMS, and whose arbitrations JAMS
8    has determined are subject to the Minimum Standards, but for whom Twitter has refused to abide
9    by the Minimum Standards and pay the arbitration fees in full." Pet. ¶ 16.

10   Based upon this prior definition, only one individual has been compelled to arbitration that
11   might arguably be considered a putative class member. In *Weber v. X Corp.*, No. 23-cv-233, 2024
12   WL 470255 (E.D. Wash. Jan. 8, 2024), Arnaud Weber, Twitter's former Vice President of
13   Consumer Engineering, argued that the court should find that Twitter waived its right to arbitrate
14   because it had "disputed the applicability of certain JAMS rules," and in support of that contention
15   Weber attached the Twitter/JAMS correspondence on applying the JAMS Minimum Standards.
16   Meckley Supp. Decl., Exs. 6, 7. The court expressly rejected Weber's argument that Twitter had
17   waived its right to arbitrate and compelled Weber to arbitration. *Weber*, 2024 WL 470255, at *1,
18   *6-7. Weber also had requested that any order compelling arbitration also specifically direct
19   Twitter "to comply with JAMS Rules and JAMS's rulings on and interpretations of its own rules."
20   *See* Meckley Supp. Decl., Ex. 6, at 10. The court refused to grant such relief. Instead, the court
21   "order[ed] the parties to proceed to arbitration and to strictly observe the terms of the DRA."
22   *Weber*, 2024 WL 470255, at *8 (citing 9 U.S.C. § 4). Weber is likely not a member of the putative
23   class defined in Petitioner's original Petition, however, because Weber's lawsuit was dismissed
24   with prejudice not long after the court's ruling (*see* Meckley Supp. Decl., Ex. 8) and thus arbitration

---

[1] Twitter has not made a similar offer with respect to the JAMS arbitrations because JAMS, unlike the AAA, has not agreed to abide by any individual arbitrators' determinations on fee sharing. JAMS, via communications from its General Counsel Sheri Eisner, stated that it will merely "tak[e] the arbitrator's position into consideration" but will ultimately "make a final determination" for itself. Dkt. 6-3 (Am. Pet. Ex. C) at 1. That approach, as discussed in answer to the Court's fourth question, directly conflicts with the DRAs' plain terms.

was never initiated, so JAMS never purported to determine that Weber's claims were subject to the Minimum Standards.

One of the named Petitioners, putative class representative Grae Kindel, was successfully compelled to arbitration in *Cornet v. Twitter, Inc.*, No. 22-cv-6857, 2023 WL 187498, *1 (Jan. 13, 2023). Kindel was not in the original Petition's putative class because Kindel's arbitration is not being administered by JAMS. Rather, Kindel is among the group of AAA claimants for whose arbitrations Twitter proposed to advance arbitration fees conditioned on the right to obtain reimbursement if so ordered by the arbitrator. *See* Dkt. 36 (Meckley Decl.), Ex. 3, at 3.

In response to the second element within the Court's first question—how this should impact the Court's consideration of Petitioners' Motion—Twitter submits that the prior orders compelling Weber and Kindel to arbitration point in favor of *denying* the Petitioners' motion. Two other district courts compelled Weber and Kindel to arbitration, and the *Weber* court flatly rejected Weber's specific request that the court order Twitter to comply with JAMS's opinion that the Minimum Standards governed payment of arbitration fees. To the extent this proceeding were to alter the terms of the parties' obligations to arbitrate pursuant to the orders applicable to Weber and Kindel, it would violate principles of *res judicata* and comity. *See, e.g.*, *Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711, 713 (9th Cir. 1992) ("[A]n order compelling arbitration is given preclusive effect under California law[.]"); *Tarverdiyeva v. Coinbase, Inc.*, No. 22-cv-5468, 2022 WL 17995542, at *2 (N.D. Cal. Dec. 29, 2022) (dismissing action "as barred by *res judicata* on account of the order compelling arbitration filed by the District Court for the Middle District of Florida").

## II.     THE ARBITRATION LOCATIONS AND VENUE PROVISION

The Court's second question is: "If the Court agrees with Petitioners that they may move to compel arbitration in this district even though the arbitrations at issue were filed outside this district, must the Court compel arbitration to occur in this district notwithstanding the venue provisions of the arbitration agreements? *See* 9 U.S.C. § 4; *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 785 (9th Cir. 2001); *Cont'l Grain Co. v. Dant & Russell, Inc.*, 118 F.2d 967, 968-69 (9th Cir. 1941)." Order 1.

Petitioners cited two cases in their Reply (Dkt. 37) that construed *Textile Unlimited* and *Continental Grain* as allowing a district court to compel arbitration within its boundaries even if that contradicted the arbitration-location provision in the parties' agreement. *See, e.g.*, *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-cv-715, 2012 WL 3757486, at *5 (N.D. Cal. July 5, 2012); *Seaman v. Priv. Placement Cap. Notes II, LLC*, No. 16-cv-578, 2017 WL 1166336, at *6 (S.D. Cal. Mar. 29, 2017). However, Twitter identified other decisions from within this Circuit holding that *Textile Unlimited* and *Continental Grain* do **not** support compelling arbitration in a location different from the one selected in the arbitration agreement. *See, e.g.*, *Puri v. Golden Temple of Oregon, LLC*, No. 10-cv-882, 2010 WL 11595757, at *4 & n.1 (C.D. Cal. June 9, 2010); *Simplicity Int'l v. Genlabs Corp.*, No. 09-cv-6146, 2010 WL 11507526, at *10-11 (C.D. Cal. May 6, 2010); Twitter Opp. 8. Contrary to Petitioners' (mis)characterization (Reply 11-12), the latter view represents the "majority" position among Ninth Circuit district courts. *See Hoyt v. WeLink Commc'ns, Inc.*, No. 23-cv-287, 2024 WL 169671, at *4 (D. Ariz. Jan. 16, 2024) (agreeing with the "majority" position that courts may not compel arbitration outside their boundaries but also may not compel arbitration in violation of the location chosen in the arbitration agreement).

More importantly, the majority view is the correct view under the Federal Arbitration Act ("FAA"). The Supreme Court has made clear that the "first principle" of the FAA is that "arbitration is strictly a matter of consent." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 651 (2022) (citation, brackets, and quotation marks omitted). The Supreme Court has repeatedly recognized that "[p]arties may generally shape such agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019). And "[w]hatever they settle on, the task for courts and arbitrators at bottom remains the same: 'to give effect to the intent of the parties.'" *Id.* This directive is written straight into Section 4 of the FAA: the Court's authority under that provision is limited to "directing the parties to proceed to arbitration ***in accordance with the terms of the agreement***." 9 U.S.C. § 4 (emphasis added); *see also Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) ("By its terms, section 4 of the FAA limits the court's discretion; the court must order the parties

to proceed to arbitration only in accordance with the terms of their agreement.").

*Textile Unlimited* and *Continental Grain* do not support a different result on the facts of this case. In *Textile Unlimited*, the Ninth Circuit addressed "the proper venue for a suit to enjoin an arbitration" (as opposed to a suit to compel arbitration). 240 F.3d at 783. The plaintiff in *Textile Unlimited* filed an action in California to enjoin an arbitration in Georgia on the ground that the parties had not formed an agreement to arbitrate. *Id.* at 784. The Ninth Circuit affirmed the district court's injunction. *Id.* at 787-88. The plaintiff in *Textile Unlimted* did not ask the Ninth Circuit to order arbitration anywhere, let alone in a location other than the one expressly chosen by the parties in the arbitration agreement; rather, that plaintiff insisted that it did *not* have to arbitrate. In siding with the plaintiff, the Ninth Circuit specifically contrasted the venue question in that case—*i.e.*, venue for "injunction actions"—with the venue question in *this case*—*i.e.*, venue for "actions to compel arbitration." *Id.* at 785. This distinction was the reason why the Ninth Circuit did not follow *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323 (7th Cir. 1995), the case that Twitter highlighted in its Opposition as most applicable and persuasive here based on the facts of this case. *Textile Unlimited*, 204 F.3d at 785 n.1; Twitter Opp. 8. Extending *Textile Unlimited* to an "action to compel arbitration," such as the present case, would conflict with the Ninth Circuit's reasoning, even if some loose dicta in the opinion might be thought to sweep more broadly. *See Simplicity*, 2010 WL 11507526, at *11 ("[T]he court specifically cabined its ruling to injunction actions.").[2]

Unlike *Textile Unlimited*, *Continental Grain* did address a petition to compel arbitration under Section 4, but its facts are inapposite to the present case. The party that filed the Section 4 petition (Continental Grain) chose to file suit in Oregon even though the arbitration agreement

---

[2] *Textile Unlimited* also cited *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 194-96 (2000), for the proposition that "the FAA's venue provisions are discretionary, not mandatory." *Textile Unlimited*, 240 F.3d at 784. However, in *Cortez Byrd Chips*, the Supreme Court was addressing venue for actions to vacate or modify arbitration awards under 9 U.S.C. §§ 10-11, which the Court analyzed together with 9 U.S.C. § 9. The Supreme Court did not address venue for Section 4 petitions, and because there was no Section 4 petition in *Textile Unlimited*, neither case supports Petitioners' argument that courts may compel arbitration under Section 4 in locales that contravene the location specified in the arbitration agreement. *See, e.g.*, *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219 (10th Cir. 2005) ("*Cortez Byrd Chips* specifically addresses §§ 9-11, not § 4.).

required arbitration in New York. 118 F.2d at 968. The respondent (Dant & Russell) insisted that arbitration occur in Oregon, where it was based and where the Section 4 petition had been filed, and the district court simply agreed. *Id.* The petitioner (Continental Grain) then appealed, arguing that the agreement required arbitration in New York. The Ninth Circuit rejected the argument, stressing that Continental Grain "invoked the jurisdiction of a court other than that having jurisdiction in New York to enforce the agreement" and thus was "hardly in a position to complain that it has exercised that jurisdiction in accordance with the statute giving it jurisdiction." *Id.* at 969. As the Court observed, Congress wrote into Section 4 the "condition that the arbitration be held in the district where the court sits." *Id.* Continental Grain was on notice of that explicit statutory condition when it filed its Section 4 petition in Oregon and therefore had no basis to object to the district court's application of that condition.

Here, in contrast, Petitioners chose this venue. Twitter had no say in Petitioners' choice of venue and never waived its objection to compelling arbitration in this venue. Twitter maintains that Section 4 authorizes arbitration to be compelled *only* in the agreed upon location as specified in the DRA. Twitter Opp. 8-9, 18-20. Petitioners may not override that term of the DRA merely by unilaterally choosing to file their petition in this Court. *See Lauer*, 49 F.3d at 328 (rejecting suggestion that a "party to an arbitration agreement could avoid the effect of the agreed-to forum merely by filing suit in a different district" (citation omitted)). *Textile Unlimited* and *Continental Grain*, when properly read in the context of their facts, do not support a different result.

Refusing to enforce the parties' mutually chosen location for their arbitrations under the terms of the DRA and requiring a "restart" of arbitration in this District produces inefficiency and negates a material term of the DRA. Indeed, it would effectively render any venue provision in an arbitration agreement a nullity because it would allow any party to any arbitration agreement to unilaterally change the location of arbitration, simply by moving to compel arbitration in a different district. The Court should not impose that result unless required by binding Ninth Circuit precedent, and neither *Textile Unlimited* nor *Continental Grain* compel such a result. Instead, Twitter once again urges the Court to adhere to Supreme Court precedent and "'rigorously enforce' [the parties'] arbitration agreements according to their terms," *Am. Exp. Co. v. Italian Colors Rest.*,

570 U.S. 228, 233 (2013) (citation omitted), and deny the Petition in full, consistent with both Section 4's geographic limitation and the DRA's geographic requirement. Twitter Opp. 8-9.

Alternatively, if the Court were permitted to disregard the venue provision in an arbitration agreement (which it is not), then it would be required to compel arbitration in this District. Both *Textile Unlimited* and *Continental Grain* are crystal-clear that Section 4 "confines the arbitration to the district in which the petition to compel is filed." *Textile Unlimited*, 240 F.3d at 785; *see also Cont'l Grain*, 118 F.2d at 969 (Congress "has made a condition that the arbitration be held in the district where the [Section 4] court sits."); *Sovak v. Chugai Pharm. Co.*, 289 F.3d 615, 615 (9th Cir. 2002) (describing *Continental Grain* as "holding that § 4 of the FAA limits a court to ordering arbitration within the district in which the suit was filed"). That is the approach taken by the district court decisions that Petitioners cite. *See Beauperthuy*, 2012 WL 3757486, at *6; *Seaman*, 2017 WL 1166336, at *6. Petitioners have suggested that the Court can, on the one hand, apply *Textile Unlimited* and *Continental Grain* but, on the other hand, disregard their instruction that arbitration must be compelled within the Section 4 court's boundaries. Reply 12 n.10. However, the two inapposite cases Petitioners cite for this suggestion do not even address *Textile Unlimited* or *Continental Grain* and thus cannot support Petitioners' attempt to disregard those cases' interpretation of the geographic limits of Section 4. *See Shearson Lehman Bros. v. Brady*, 783 F. Supp. 1490, 1498 (D. Mass. 1991) (declining to issue order compelling arbitration on specified procedural terms); *Flora v. Prisma Labs, Inc.*, No. 23-cv-680, 2023 WL 5061955, at *7 (N.D. Cal. Aug. 8, 2023) (severing arbitration-location clause from agreement because it required consumers to arbitrate in a location distant from their hometown).

### III. DIFFERENCES BETWEEN THE ARBITRATION AGREEMENTS

The Court asks, "Do the different versions of the arbitration agreements have any impact on the Court's rulings, or should the results be the same regardless of which version Petitioner signed?" Order 1.

The only difference between the different versions of the DRA that has any potential impact here is that the version signed by Petitioners Kindel and Rosen (which Twitter's Opposition labeled "DRA #3") does not select JAMS as the arbitration provider or identify the rules under which

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

arbitration is to be conducted. *See* Twitter Opp. 3; Dkt. 6-1, Exs. A-5, A-6. Although Twitter contends that no version of the DRA can properly be read to allow general JAMS or AAA policies or rules to override the fee-apportionment required by Section 6 of the DRA, *see* Twitter Opp. 12-16, it is clearly impossible to read DRA #3 to impose such a result, *see* Twitter Opp. 13. DRA #3 contains no language that provides a "hook" for overriding Section 6 through an arbitration provider's policies or rules.

Petitioners have suggested that this difference does not matter, citing a stipulation to proceed under the AAA's employment arbitration rules for Petitioners Kindel and Rosen. Reply 4; Dkt. 6-8. But, contrary to Petitioners' description, that stipulation does not "incorporat[e] . . . AAA's rules into [the parties'] agreements." Reply 4. In certain cases, Twitter has stipulated to arbitration administered by the AAA under its "Employment Arbitration Rules." *See* Dkt. 6-8. Petitioners highlight no provision in the then-applicable version of the AAA Employment Arbitration Rules that purports to override an arbitration agreement's fee-apportionment provision.[3] Petitioners contend that the AAA Employment Arbitration Rules "incorporate AAA's Fee Schedule." Reply 6. That is not true. The page Petitioners cite merely states, "For the current Administrative Fee Schedule, please visit www.adr.org/employmentfeeschedule." AAA, *Employment Arbitration Rules and Mediation Procedures* 26 (2017) (emphasis and some capitalization omitted), https://www.adr.org/sites/default/files/EmploymentRules_Web_2.pdf. Given that nothing in the AAA rules specifically negates Section 6 of DRA #3, it would be inappropriate to infer that a general acceptance of the AAA rules "govern[s] over express provisions in the [agreement] to the contrary." *Goobich v. Excelligence Learning Corp.*, No. 19-cv-6771, 2020 WL 5593011, at *3 (N.D. Cal. Sept. 18, 2020); Twitter Opp. 14.[4]

---

[3] In a footnote, Petitioners cite the 2016 version of the AAA Employment Arbitration Rules and Mediation Procedures, which do discuss AAA's role in making an initial administrative determination as to which of the then-current AAA arbitration costs sections would govern. *See* Reply 5 n.1. However, that version was no longer in effect at the time of the parties' stipulation in 2023. *See* Dkt. 6-8; Reply 6-7 (discussing the 2017 revision of the AAA Employment Arbitration Rule sand Mediation Procedures).

[4] Petitioners highlight *Pope v. Sonatype, Inc.*, No. 15-cv-956, 2015 WL 2174033, at *4 (N.D. Cal. May 8, 2015), but that case is not applicable here. The court in *Pope* accepted an employer's after-the-fact argument that the agreement's expansive fees provision—which provided for shifting of attorney's fees to the prevailing party, among other things, and was likely unconscionable under

## IV. WHETHER THE JAMS AND AAA DETERMINATIONS BIND THE COURT.

The Court next asks, "The arbitration agreements provide, 'If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and *any disputes in that regard will be resolved by the Arbitrator*.' *E.g.*, ECF No. 6-1 at 4, 21 (emphasis added). JAMS and AAA have ruled on the parties' disputes regarding payment of fees. Assuming Petitioners' motion is procedurally proper, does the Court have the authority to reverse those rulings?"

First, Twitter believes it important to clarify a potential misunderstanding inherent in the Court's question. The Court italicized the language in Section 6 of the DRA stating that "any disputes in that regard will be resolved by the Arbitrator." Order 2. This language highlights a serious problem with the JAMS and AAA determinations. Through this language, the DRA specifically delegates the authority to resolve fee-apportionment disputes to "*the Arbitrator*" in each individual case, *not* to JAMS or AAA as organizations. The DRA consistently uses "the Arbitrator" to refer to the individual merits arbitrator, not JAMS itself or any other arbitration-provider organization.[5] For example, Section 3 of the DRA says, "*The Arbitrator* shall be selected by mutual agreement of the Company and the Employee" and "shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted." DRA § 3. This language plainly refers to the individual arbitrator, not to JAMS or AAA as organizations nor to their administrative staff. Section 5 gives the individual arbitrator the ability to resolve disputes over discovery, motions practice, and presenting evidence: "any disputes in this regard shall be

---

California law—was overridden by the JAMS Minimum Standards and could be severed from the agreement to allow its enforcement. *Id.* at *4, *6 n.1. The court did not suggest that incorporation of JAMS (or AAA) rules automatically displaces provisions on sharing arbitration fees. Petitioners also cite *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074-75 (9th Cir. 2013), but that case addressed the unique question whether incorporating an arbitration providers' rules constitutes clear-and-unmistakable evidence that the parties agreed to arbitrate arbitrability.

[5] Notably, the JAMS and AAA arbitration rules also consistently adhere to this distinction between the individual arbitrators and JAMS and AAA as organizations. *See, e.g.*, JAMS, *Employment Arbitration Rules & Procedures*, Rules 5(c), 6(b), 7, 8, 9(c), 11(c), 15, 31(a) (June 1, 2021), https://www.jamsadr.com/files/Uploads/Documents/JAMS-Rules/JAMS_employment_arbitration_rules-2021.pdf; AAA Employment Rules 5, 7, 10, 11, 13, 14, 15, 16(b), 18, 37, 38(b), 44, 45.

resolved by *the Arbitrator*." DRA § 5. In the same vein, Section 7 states that "[t]he parties will arbitrate their dispute before *the Arbitrator*, who shall . . . apply substantive law as applicable to the claims." DRA § 7. As a result, when Section 6 of the DRA states that "*the Arbitrator*" will "resolve[]" "any disputes" over fees, the parties have unambiguously agreed that the only person vested with authority to resolve disputes regarding apportionment of fees shall be the individual attorney or retired judge appointed to preside over the merits of the individual arbitration. Neither JAMS nor AAA are "the Arbitrator" referenced in the DRA language; rather, they are administrative bodies that merely facilitate the appointment of "the Arbitrator." As a result, no "ruling" as to apportionment of fees has been made by "the Arbitrator" as required by the DRA. Indeed, this goes to the heart of the issue before the Court: Twitter simply seeks to have the Arbitrator in each case decide this issue, but Petitioners, not Twitter, refuse to allow that outcome.

Second, to the extent JAMS's and/or AAA's decisions regarding fees have any bearing on Petitioners' Motion (Twitter contends they should not), the short answer to the Court's question is: "Yes, the Court has authority not to follow those rulings." In fact, the Court has an *obligation* not to follow those rulings because they are inconsistent with the terms of the DRA. Before the Court may grant a petition to compel arbitration under Section 4, the Court must assure itself that the requested relief is "in accordance with the terms of the agreement." 9 U.S.C. § 4. The Ninth Circuit explained that requirement as it relates to Section 4 orders requiring payment of arbitration fees in *Lifescan*. There, the district court granted a Section 4 order requiring one of the parties to the arbitration to pay a pro-rata share of arbitration fees so the arbitration could continue. 363 F.3d at 1011. The Ninth Circuit reversed that ruling because the ordered payment was inconsistent with the terms of the parties' agreement, which left fee disputes to the arbitrators, who in turn had given the other side the option to advance the fees subject to an expectation of recoupment, if successful. *Id.* The Ninth Circuit determined that the arbitrators acted well within the discretion afforded them by the parties' agreement when they declined to order the payment and that the district court could not use Section 4 to order a fees payment that was contrary to the parties' agreement. *Id.* at 1013.

Under *Lifescan*'s logic, Section 4 does not empower the Court to enforce the JAMS and AAA decisions to require Twitter to pay effectively all the arbitration fees because those decisions

were inconsistent with the DRA. After *Lifescan*, the Court not only may, but must, review and reject those decisions. JAMS and the AAA did not even purport to ground their decisions in the terms of the DRA. Twitter Opp. 12-13. Nor can one reasonably read the DRA as giving JAMS and AAA (as opposed to "the Arbitrator") the authority to require Twitter to pay the full cost of the arbitration. Twitter Opp. 13-16. On the contrary, the DRA's arrangement resembles *Lifescan*, where the individual arbitrators made the final call under the parties' agreement about how to divide fees, and the Ninth Circuit reversed the district court's ruling under Section 4 that provided otherwise. 363 F.3d at 1013.

JAMS has recognized this distinction between itself and the Arbitrator appointed by the parties, but it has openly announced that it will not consider itself bound by the decisions that individual arbitrators make regarding apportionment of fees in these cases:

> As our notice in each case advised, any further issue about whether the Minimum Standards apply in a given case should be directed to the arbitrator in the case. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. *JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination.*

Dkt. 6-3 (Am. Pet. Ex. C) at 1 (emphasis added). JAMS's decision is directly contrary to the terms of the DRA, which assigns sole authority over this question to "*the Arbitrator*," not JAMS.

Under the *Lifescan* principle, the Court may not issue a Section 4 order that upholds—expressly or impliedly—JAMS's decision to usurp the Arbitrator's sole authority to resolve arbitration fee disputes. Nor may the Court issue a Section 4 order that upholds any other aspect of the JAMS or AAA decisions without first finding that those decisions comport with and adhere to the terms of the DRA (which they clearly do not). Thus, in answer to the Court's question—the Court clearly does have the authority to "reverse" the decisions by JAMS and AAA. Moreover, Twitter has every reason to believe that those organizations will comply with the Court's ruling on this issue: neither has ever ignored a court order to Twitter's knowledge, and JAMS has stated that it "will comply with [a] judicial determination" on the enforceability of arbitration agreements without compliance with the JAMS Minimum Standards. Dkt. 6-2 at 5. In ruling on Petitioners' Petition, the Court should thus make clear that the FAA and the terms of the DRA do not permit

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

1   JAMS or the AAA to require Twitter to pay effectively the full cost of arbitration when the DRA's
2   terms do not impose such a requirement and when such issue has been reserved for resolution
3   exclusively by "the Arbitrator."

### V.  THE REQUIREMENTS OF APPLICABLE LAW

The Court asks, "If the Court reaches the question, does 'applicable law' in states in which Twitter has not paid initial arbitration fees require fee-splitting or merely allow it under certain conditions? If the latter, how should that impact the Court's analysis?"

The short answer to the Court's questions are: (1) To Twitter's knowledge, applicable law in the relevant states does not create a freestanding obligation that parties split arbitration fees irrespective of the actual terms of their agreement, but it does require the Court to enforce the fee-sharing terms in the DRA; and (2) the fact that applicable law merely requires the Court to enforce the fee-sharing terms in the DRA, instead of imposing a freestanding obligation to split fees, has no impact on the Court's analysis.

As noted already, agreements governed by the FAA must be rigorously enforced according to their terms. An exception to this rule may apply based on "grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, which can sometimes include unconscionability. For arbitration-related expenses in particular, the Supreme Court has (at least for claims arising under federal statutes) adverted to an "effective vindication" exception for when the arbitration agreement operates as a prospective waiver of a party's ability to pursue statutory remedies. *Italian Colors*, 570 U.S. at 235; *see Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000) ("It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration."). Many states have addressed arbitration costs under this effective-vindication rubric. *See, e.g.*, *Brady v. Williams Cap. Grp., L.P.*, 928 N.E.2d 383, 387 (N.Y. 2010); *Clark v. Renaissance W., LLC*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013). However, neither generally applicable contract-law doctrines like unconscionability nor the effective-vindication exception would require fee-splitting in a manner beyond what the agreement provided.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

RESPONDENTS' SUPPLEMENTAL BRIEF
CASE NO. 3:23-cv-3301

Instead, the "applicable law" that governs the fee dispute is the usual FAA rule that requires enforcing agreements according to their terms unless an exception applies. Read as a whole, the key language in Section 6 of the parties' DRA must be read as requiring pro-rata fee sharing, in jurisdictions where such fee sharing is lawful, unless the employee provides evidence that justifies a different allocation, determined on an individual case-by-case basis:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

DRA § 6. The natural meaning of to "apportion" is to divide proportionally. *See Oxford English Dictionary* 579 (2d ed. 1989) ("To assign in proper portions or shares; to divide and assign proportionally; to portion out, to share"); *Webster's New International Dictionary* 132 (2d ed. 1955) ("To divide and assign in just proportion; to divide and distribute proportionally; to make an apportionment of; portion out; to allot"). That is also the default fee arrangement under the JAMS arbitration rules, to the extent they are relevant, in cases like this one where the arbitration agreement is *not* required as a condition of employment. JAMS Employment Rule 31(a) ("[E]ach Party shall pay its pro rata share of JAMS fees and expenses"). So, where the arbitration involves one claimant and one respondent, apportionment would be a 50/50 allocation, subject to a claimant's ability to persuade an arbitrator, on an individual "case-by-case" basis under the effective-vindication doctrine, that a different proportion is appropriate based on individualized evidence of hardship or deterrence. *Brady*, 928 N.E.2d at 387-88; *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 554 (4th Cir. 2001).

It is inconsistent with the DRA's language to impose a *per se* rule requiring Twitter to pay effectively the whole cost of arbitration in every case even when applicable law rejects "a broad per se rule against all fee-splitting irrespective of the circumstances surrounding each individual's case." *Bradford*, 238 F.3d at 554. Such a reading would make all the language in Section 6 of the DRA block-quoted above superfluous. The two sentences clearly embrace different outcomes depending on the requirements of applicable law. That distinction would be meaningless if "the

Company will pay the Arbitrator's and arbitration fees" regardless of what applicable law requires. Bedrock contract-interpretation principles preclude an interpretation of Section 6 that would make its fees provision meaningless surplusage, and so the Court should reject any such interpretation. *See, e.g.*, *Goobich*, 2020 WL 5593011, at *3; Twitter Opp. 14.  Instead, the Court should hold that Section 6 of the DRA requires proportional allocation of the arbitrator and arbitration fees—subject to an individual claimant's ability to establish for "the Arbitrator" a reason to justify a different allocation.

\* \* \*

For all these reasons and those stated in the Twitter Opposition (Dkt. 35), the Court should deny Petitioners' Motion to Compel Arbitration and for Preliminary Injunction (Dkt. 26) and Amended Class Petition to Compel Arbitration (Dkt. 6).

Dated: March 22, 2024                              Respectfully submitted,

                                                   MORGAN, LEWIS & BOCKIUS LLP

                                                   By  */s/ Eric Meckley*
                                                       Eric Meckley
                                                       Brian D. Berry
                                                       Michael E. Kenneally

                                                       Attorneys for Respondents