MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel:    +1.415.442.1000
Fax:    +1.415.442.1001

Michael E. Kenneally, *pro hac vice*
michael.kenneally@morganlewis.com
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004-2541
Tel:    +1.202.739.3000
Fax:    +1.202.739.3001

Attorneys for Respondents
TWITTER INC., and X CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| FABIEN HO CHING MA, LAILA AMLANI, JONATHAN WILLIS, MELISSA OLSON, SASHA SOLOMON, RYAN CROWLEY, GRAE KINDEL, SARAH ROSEN, and ADAM TREITLER,<br><br>Petitioners,<br><br>v.<br><br>TWITTER, INC., and X CORP.,<br><br>Respondents. | Case No. 4:23-cv-3301<br><br>**SUPPLEMENTAL DECLARATION OF ERIC MECKLEY IN SUPPORT OF RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**SUPPLEMENTAL DECLARATION OF ERIC MECKLEY**

2

Pursuant to 28 U.S.C. § 1746, I, Eric Meckley, declare as follows:

3

1.      I am an attorney with the law firm of Morgan, Lewis & Bockius LLP and duly

4

licensed to practice law in the State of California and in the United States District Court for the

5

Northern District of California.  I am counsel for Respondents Twitter, Inc. and X Corp. (as

6

successor in interest to Twitter, Inc.) in the above-captioned matter.  I submit this Supplemental

7

Declaration in support of Respondents' Opposition to Petitioners' Motion to Compel Arbitration.

8

I have personal knowledge of the facts stated in this Supplemental Declaration and could testify

9

competently to them if asked to do so.

10

2.      I served as counsel of record to X Corp. in *Weber v. X Corp.*, No. 2:23-cv-00233-

11

TOR (E.D. Wash.).

12

3.      On December 5, 2023, the plaintiff in that action, Arnaud Weber, submitted a

13

response to X Corp.'s motion to compel arbitration, along with a supporting declaration from

14

Michael C. Subit.  Attached as **Exhibit 6** is a true and correct copy of Weber's December 5, 2023

15

response to X Corp.'s motion to compel arbitration.  Attached as **Exhibit 7** is a true and correct

16

copy of Subit's December 5, 2023 declaration.

17

4.      On January 22, 2024, the parties in the *Weber* action filed a stipulation to dismiss

18

the action in its entirety, with prejudice.  The district court in *Weber* entered an order dismissing

19

the action with prejudice on January 23, 2024.  Attached as **Exhibit 8** is a true and correct copy of

20

the *Weber* court's dismissal order.

21

I declare under penalty of perjury under the laws of the United States of America that the

22

foregoing is true and correct.

23

Executed this 22nd day of March, 2024, in San Francisco, California.

24

25

                                                        */s/ Eric Meckley*

26

                                                        Eric Meckley

27

28

SUPPLEMENTAL DECLARATION OF
ERIC MECKLEY ISO OPPOSITION TO
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-cv-3301

# EXHIBIT 6

THE HONORABLE THOMAS O. RICE

Michael C. Subit
Ellicott K. Dandy
Frank Freed Subit & Thomas LLP
705 2nd Avenue, Suite 1200
Seattle, WA 98104
Ph: (206) 682-6711

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ARNAUD WEBER,<br><br>       Plaintiff,<br><br>   v.<br><br>X CORP., ELON MUSK, LINDA YACCARINO, and JOHN/JANE DOES III-V,<br><br>       Defendants. | Case No. 2-23-cv-00233-TOR<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT X CORP.'S MOTION TO COMPEL ARBITRATION**<br><br>December 22, 2023<br>Without Oral Argument |

# I. INTRODUCTION

This Court should deny Defendant X Corp.'s Motion to Compel Arbitration because X Corp. breached the parties' arbitration agreement and waived its right to arbitrate Plaintiff Arnaud Weber's claims by repeatedly refusing to arbitrate. In the alternative, Weber respectfully asks the Court to compel X Corp. to arbitrate in accordance with the JAMS Rules and JAMS's rulings. X Corp. seeks dismissal of this action, *see* ECF No. 11 (Mot.) at 1, but because Weber also asserts claims against Defendants Elon Musk and Linda Yaccarino that are not arbitrable, there is no basis to dismiss or stay this case.

## II. BACKGROUND

Weber began working at Twitter, now X Corp., in 2019. ECF No. 1 ("Compl.") ¶ 4.1. Weber signed the Dispute Resolution Agreement ("DRA"), which provides in part, "The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party." *See* ECF No. 12 at 10-13 (DRA) § 4. On July 1, 2022, Twitter offered Weber, who had become Vice-President of Engineering, Compl. ¶ 4.2, a "one-time cash award of $1,500,000" payable in four installments, provided he remained continuously employed through each payment date. *See* Declaration of Michael Subit ¶ 2, Ex. A. Although Weber was continuously employed by Twitter through January 1, 2023, when the second installment was due, Twitter

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 2
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

did not pay that installment. Compl. ¶ 4.9. Twitter terminated Weber's employment on January 4, 2023. *Id.* ¶ 4.10. Defendants have not paid the $375,000 due to Weber. *Id.* ¶ 4.11.

On April 10, 2023, Weber transmitted an arbitration demand to Twitter's legal department via certified mail. *See* Subit Decl. ¶ 3, Ex. B ("Arbitration Demand"); *see also* DRA § 4. Weber received no response. Subit Decl. ¶ 4. On June 8, 2023, Weber sent a demand letter via certified mail to Linda Yaccarino, CEO of Twitter. *Id.* ¶ 5, Ex. C. This letter warned that if Twitter failed to respond to the Arbitration Demand by June 30, 2023, Weber would pursue his claims in court. *Id.* Yaccarino never responded. *Id.* ¶ 6.

Weber is one of thousands of former employees whose claims X Corp. has refused to resolve per the terms of the DRA. *See, e.g.,* Subit Decl. ¶ 7, Ex. D ¶ 140 (explaining that hundreds of arbitration demands "have languished in a dispute resolution no-man's-land, unable to move forward . . . due to Defendants' persistent and intentional efforts to delay the proceedings at every stage."). Where arbitration has commenced, X Corp. has not participated in good faith. For instance, in hundreds of cases, X Corp. disputed the applicability of certain JAMS rules, and when JAMS ruled against X Corp., it simply refused to arbitrate those cases. *See Id.* ¶ 8, Ex. E & ¶ 9, Ex. F. The affected employees were forced to move to compel arbitration against X Corp. in federal court. *Id.* ¶ 10, Ex. G. X

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 3
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Corp.'s pattern of weaponizing its arbitration agreements is well documented. *See, e.g.,* Daniel Wiessner, *Twitter stalling hundreds of ex-workers' legal cases: lawsuit*, Reuters, July 3, 2023; Joel Rosenblatt, *Twitter Accused of Ducking a Fight Over Musk's Mass Layoffs*, Bloomberg, July 3, 2023 ("Company demanded arbitration but won't engage.").

Weber filed this action on August 17, 2023, bringing claims against Defendant X Corp. for breach of contract, promissory estoppel, failure to pay wages due in violation of RCW 49.48, and willful withholding of wages in violation of RCW 49.52. Compl. In his original complaint, he brought claims for willful withholding of wages in violation of RCW 49.52 against Doe Defendants I-V. *Id.* ¶¶ 3.3, 8.1-8.7. On November 27, in accordance with Fed. R. Civ. P. 15(a)(1)(B), Weber amended his complaint to name Musk and Yaccarino in place of Doe Defendants I-II. ECF No. 18.

### III.   ANALYSIS

X Corp. cannot enforce the DRA because it materially breached the DRA by refusing Weber's demand to arbitrate. Even if X Corp.'s refusal was not a material breach, X Corp. waived its right to arbitrate through the same acts. In the alternative, if the Court compels arbitration, it should do so on the condition that X Corp. abide by the DRA as well as the JAMS Rules and JAMS's interpretations thereof.

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 4
Case No. 2-23-cv-00233-TOR

**A.     Weber Demanded Arbitration in Accordance with the DRA.**

X Corp. argues that because the DRA incorporates JAMS Rules, Weber could have submitted an arbitration demand directly to JAMS after X Corp. refused to arbitrate. *See* Mot. at 2, 8. X Corp. misrepresents the clear terms of the DRA, which provide that JAMS Rules govern *only* "[d]iscovery and conduct of the arbitration hearing." DRA § 5. The DRA does not incorporate the JAMS Rules into the process for initiating arbitration, and instead expressly requires a party to submit a written arbitration demand by first class mail as the sole means of initiating arbitration. *Id.* § 4. That is exactly what Weber did.

X Corp.'s interpretation would render Section 4 superfluous, but the Court must give effect to all provisions of the DRA. *Snohomish Cnty. Pub. Trans. Benefit Area Corp. v. FirstGroup America, Inc.*, 173 Wn.2d 829, 840, 271 P.3d 850 (2012) ("interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective . . . ."); *Chiron Corp. v. Ortho Diagnostic Systs., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (noting that the Federal Arbitration Act (FAA) "requires the [C]ourt to enforce the arbitration agreement in accordance with its terms."); *see also* DRA § 10 ("This Agreement is the full and complete agreement . . . ."). X Corp.'s argument that Weber should have filed his arbitration demand directly with JAMS fails.

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 5
Case No. 2-23-cv-00233-TOR

**B.   X Corp Cannot Enforce an Agreement it Has Materially Breached.**

An employer "cannot compel [its former employee] to honor an arbitration agreement of which it is itself in material breach." *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1006 (9th Cir. 2005). "[W]hen an employer enters into an arbitration agreement with its employees, it must itself participate in properly initiated arbitration proceedings or forego its right to compel arbitration." *Id.* "A party is barred from enforcing a contract it has materially breached." *Rosen v. Ascentry Techns., Inc.*, 143 Wn. App. 364, 369, 177 P.3d 765 (2008). A breach is material if it "goes to the root or essence of the contract[.]" *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014).

X Corp. twice refused Weber's demands to arbitrate his cash award claims. Allowing X Corp. to now compel arbitration notwithstanding its initial refusal to arbitrate would "set up a perverse incentive scheme," under which employers would have a license to "refuse to arbitrate claims brought by employees in the hope that the frustrated employees would simply abandon them." *Brown*, 430 F.3d at 1012. *Brown* compels rejection of X Corp.'s motion. *See id.*

X Corp. materially breached the DRA when it refused to arbitrate Weber's claims and thus cannot now enforce the DRA against him. *See Rosen*, 143 Wn. App. at 369; *Brown*, 430 F.3d at 1006. The "essence" of the DRA is to require the parties to arbitrate disputes arising from Weber's employment. *DC Farms*, 179

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 6
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Wn. App. at 220; DRA § 1. Refusing to arbitrate a covered claim is a material breach of the DRA. X Corp. concedes the DRA covers Weber's claims in this action against it and does not argue that the Arbitration Demand was inadequate or that arbitration was not properly commenced. *See generally* Mot.

In short, the Court must deny X Corp.'s motion to compel arbitration because under Washington law, X Corp. cannot enforce a contract it has materially breached. *See Brown*, 430 F.3d at 1012; *Rosen*, 143 Wn. App. at 369. To rule otherwise would create precisely the "perverse incentive scheme" that the Ninth Circuit rejected in *Brown*. 430 F.3d at 1012.

## C.    X Corp. Waived Its Right to Arbitrate this Dispute

Moreover, X Corp. waived the right to arbitrate this dispute because it (1) knew of its existing right to arbitrate the dispute and (2) took intentional acts inconsistent with that existing right. *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023) (citing *Hill v. Xerox Bus. Servs.*, 59 F.4th 457, 468-69 (9th Cir. 2023)). "[T]here is no 'concrete test'" for assessing the second prong; the Court must "consider the totality of the parties' actions." *Hill*, 59 F.4th at 471 (citing *Van Ness Townhouses v. Mar. Indus. Corp.*, 862 F.2d 754, 756, 759 (9th Cir. 1988)). Following *Morgan v. Sundance, Inc.*, 596 U.S. 411, 416 (2022), "there is no 'strong federal policy favor favoring enforcement of arbitration agreements,'" and "the burden [of showing waiver] is no longer 'heavy.'"

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1    *Armstrong*, 59 F.4th at 1014. This burden "is the same as the burden for

2    establishing waiver in any other contractual context." *Id.* at 1015. In Washington,

3    waiver is simply "the intentional relinquishment of a known right." *Wagner v.*

4    *Wagner*, 95 Wn.2d 94, 102, 621 P.2d 1279 (1980). Here, X Corp. waived its right

5    to compel arbitration by repeatedly refusing Weber's demand for arbitration until

6    he filed this action in federal court seeking redress of his legal claims.

7

8        X Corp. argues that it did not act inconsistently with the right to arbitrate

9    because it "immediately moved to compel" arbitration, Mot. at 7, but that is a

10    distortion of the undisputed factual record. X Corp. knowingly refused to

11    participate in arbitration when Weber first demanded it in April 2023. *See supra*

12    § II. X Corp. again refused to proceed with arbitration when Weber demanded it a

13    second time in June 2023, knowing that doing so would result in his filing

14    litigation. *Id.* All told, X Corp. waited *more than seven months* after Weber

15    demanded arbitration to file the instant motion to compel. *See id.*; *see* Mot.

16    Because Weber had to file a federal lawsuit as a precondition to X Corp.'s

17    compliance with its own arbitration agreement, X Corp. has taken tactical

18    advantage of the litigation process. That itself is an act inconsistent with an

19    intention to arbitrate. *See Brown*, 430 F.3d at 1012-13 (finding waiver where

20    plaintiff was forced to sue as a last resort).

21

22

23

24

25

26

27

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 8
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1    X Corp. does not deny that twice refusing Weber's demands for arbitration

2    and forcing him to incur the cost of filing this litigation to obtain a resolution of

3    his legal claims were intentional acts. *See* Mot. Nor does it contest that these acts

4    were inconsistent with X Corp.'s right to arbitrate Weber's claims. *See id.; Hill*,

5    59 F.4th at 468-69. It is thus undisputed that X Corp. intentionally and repeatedly

6    acted inconsistently with its right to arbitrate Weber's claims under the DRA. X

7    Corp. has therefore waived its right to compel arbitration. *See Wagner*, 95 Wn.2d

8    at 102; *Hill*, 59 F.4th at 468-69.

9        X Corp.'s reliance on *Morgan v. Avis Budget Group, Inc.* for the position

10   that whether it ever responded to Weber's arbitration demand "has no bearing on

11   the question of waiver," is misplaced. Mot. at 7-8 (citing No. 2:17-cv-00869-

12   JAM-KJN, 2017 WL 3315368, at *3 (E.D. Cal. Aug. 3, 2017) (hereinafter

13   "*Avis*")). First, unlike the DRA, the *Avis* arbitration agreement required a party to

14   give the other *notice* of its claim before initiating arbitration. *Compare Avis*, 2017

15   WL 3315368 at *1 (requiring notice), *with* DRA § 4 (requiring written arbitration

16   demand as sole means of initiating arbitration). Second, in determining that pre-

17   litigation conduct did not establish waiver, *Avis* used the "heavy burden" test that

18   no longer applies. *See* 2017 WL 3315368, at *3; *cf. Armstrong*, 59 F.4th at 1014.

19       Additionally, X Corp.'s well-documented dilatory tactics undermine one of

20   the key purposes of the FAA, which "is the efficient and expeditious resolution of

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 9
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

claims." *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 989 (9th Cir. 2007) (internal quotation marks and citations omitted); *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989) (describing "congressional policy in favor of expeditious and relatively inexpensive means of settling grievances" in arbitration). Here, as in thousands of cases, X Corp. has delayed and obstructed arbitration rather than resolve former employees' disputes in accordance with the DRA. *See supra* § II. These acts are unequivocally inconsistent with the right to arbitrate and forewarn that X Corp. will not arbitrate Weber's claims in good faith. *See Hill*, 59 F.4th at 471.

For all these reasons, this Court should deny X Corp.'s motion.

**D.    In the Alternative, the Court Should Compel X Corp. to Comply with the DRA, JAMS Rules, and JAMS's Rulings.**

If the Court concludes that X Corp. did not breach the DRA or waive its right to compel arbitration, the Court should issue an order compelling arbitration within 30 days that requires X Corp. to comply with JAMS Rules and JAMS's rulings on and interpretations of its own rules. Should X Corp. refuse to comply, *see supra* § II, the Court should allow Weber to move to vacate the order compelling arbitration and to resume litigating his claims against X Corp. before this Court.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1

2

**E.    There is no Basis to Stay or Dismiss this Action Because Weber's Claims Against Defendants Musk and Yaccarino are Not Arbitrable.**

The DRA limits arbitration to claims between "the Employee and Company." *See* DRA §§ 1, 3, 5, 9. Weber has asserted claims against Defendants Musk and Yaccarino individually for violating RCW 49.52. *See* ECF No. 18 ¶¶ 8.1-8.7. Neither Musk nor Yaccarino are parties to the DRA, and Weber therefore cannot resolve his claims against them in arbitration. *See generally* DRA. Even if the Court grants X Corp.'s motion to compel arbitration, there is no basis to stay or dismiss the action with respect to Weber's claims against Musk and Yaccarino. *See, e.g., Simmons v. Morgan Stanley Smith Barney, LLC*, 872 F. Supp. 2d 1002, 1023 (S.D. Cal. 2012) (declining to stay proceedings on non-arbitrable claims).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny X Corp.'s Motion to Compel Arbitration because X Corp. breached the DRA and waived its right to arbitrate. If the Court nevertheless grants X Corp.'s motion, it should order X Corp. to comply with the DRA and JAMS Rules. In no event should the Court stay or dismiss this action because Weber's claims against defendants Musk and Yaccarino are not subject to arbitration.

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 11
Case No. 2-23-cv-00233-TOR

RESPECTFULLY SUBMITTED, this 5th day of December 2023.


FRANK FREED SUBIT & THOMAS LLP

By: _/s/ Ellicott K. Dandy_
Ellicott K. Dandy, WSBA No. 57279
Michael C. Subit, WSBA No. 29189
705 Second Avenue, Suite 1200
Seattle, Washington 98104
Phone: (206) 682-6711
Fax: (206) 682-0401
Email: msubit@frankfreed.com
Email: edandy@frankfreed.com

*Attorneys for Plaintiff Arnaud Weber*

WEBER RESPONSE TO MOT.
TO COMPEL ARBITRATION- 12
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

THE HONORABLE THOMAS O. RICE

Michael C. Subit
Ellicott K. Dandy
Frank Freed Subit & Thomas LLP
705 2nd Avenue, Suite 1200
Seattle, WA 98104
Ph: (206) 682-6711

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WASHINGTON

ARNAUD WEBER,

       Plaintiff,

    v.

X CORP., ELON MUSK, LINDA
YACCARINO, and DOES III-V,

       Defendants.

Case No. 2-23-cv-00233-TOR

**[PROPOSED] ORDER
DENYING DEFENDANT X
CORP.'S MOTION TO
COMPEL ARBITRATION**

December 22, 2023
Without Oral Argument

Upon consideration of Defendant X Corp.'s Motion to Compel for Arbitration, Plaintiff Arnaud Weber's Response thereto, Defendant's Reply, and

[PROPOSED] ORDER DENYING
DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 1
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

the entire record of this case, the Court hereby DENIES X Corp.'s Motion to

Compel Arbitration.

 

 

      IT IS SO ORDERED.

 

      DATED: _____

 

 

 

                     _____

                     HONORABLE THOMAS O. RICE
                     UNITED STATES DISTRICT COURT JUDGE

[PROPOSED] ORDER DENYING
DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 2
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1  Presented by:

2  FRANK FREED SUBIT & THOMAS LLP

3

4  Michael C. Subit, WSBA No. 29189
   Ellicott K. Dandy, WSBA No. 57279

5  705 Second Avenue, Suite 1200

6  Seattle, Washington 98104
   Phone: (206) 682-6711

7  Fax:  (206) 682-0401

8  Email:  msubit@frankfreed.com
   Email: edandy@frankfreed.com

9

10  *Attorneys for Plaintiff Arnaud Weber*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  [PROPOSED] ORDER DENYING
    DEFENDANT X CORP.'S MOTION
    TO COMPEL ARBITRATION - 3
    Case No. 2-23-cv-00233-TOR

THE HONORABLE THOMAS O. RICE

Michael C. Subit
Ellicott K. Dandy
Frank Freed Subit & Thomas LLP
705 2nd Avenue, Suite 1200
Seattle, WA 98104
Ph: (206) 682-6711

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

ARNAUD WEBER,

      Plaintiff,

   v.

X CORP., ELON MUSK, LINDA
YACCARINO, and DOES III-V,

      Defendants.

Case No. 2-23-cv-00233-TOR

**[PROPOSED] ORDER GRANTING IN PART DEFENDANT X CORP.'S MOTION TO COMPEL ARBITRATION**

December 22, 2023
Without Oral Argument

Upon consideration of Defendant X Corp.'s Motion to Compel for Arbitration, Plaintiff Arnaud Weber's Response thereto, Defendant's Reply, and

[PROPOSED] ORDER GRANTING IN PART
DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 1
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

the entire record of this case, the Court hereby GRANTS IN PART Defendant X Corp.'s Motion to Compel Arbitration and ORDERS as follows:

1. The parties are ORDERED to proceed with arbitration before JAMS in accordance with Section 5 of the Dispute Resolution Agreement by no later than 30 days after entry of this Order;

2. Arbitration will be conducted pursuant to: (1) the parties' Dispute Resolution Agreement (ECF No. 12 at 10-13); (2) the JAMS Rules, and; (3) any interpretation of the JAMS Rules or applicable Standards by a JAMS arbitrator or JAMS;

3. X Corp's. failure to adhere to any of the foregoing will serve as a basis for Weber to move to vacate this Order Compelling Arbitration; and

4. This litigation is NOT stayed with respect to Weber's claims against Defendants Elon Musk and Linda Yaccarino.

IT IS SO ORDERED.

DATED: _____

_____
HONORABLE THOMAS O. RICE
UNITED STATES DISTRICT COURT JUDGE

[PROPOSED] ORDER GRANTING IN PART
DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 2
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Presented by:

FRANK FREED SUBIT & THOMAS LLP

Michael C. Subit, WSBA No. 29189
Ellicott K. Dandy, WSBA No. 57279
705 Second Avenue, Suite 1200
Seattle, Washington 98104
Phone: (206) 682-6711
Fax:  (206) 682-0401
Email:  msubit@frankfreed.com
Email: edandy@frankfreed.com

*Attorneys for Plaintiff Arnaud Weber*

[PROPOSED] ORDER GRANTING IN PART
DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 3
Case No. 2-23-cv-00233-TOR

# EXHIBIT 7

THE HONORABLE THOMAS O. RICE

Michael C. Subit
Ellicott K. Dandy
Frank Freed Subit & Thomas LLP
705 2nd Avenue, Suite 1200
Seattle, WA 98104
Ph: (206) 682-6711

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WASHINGTON

ARNAUD WEBER,

      Plaintiff,

    v.

X CORP., ELON MUSK, LINDA
YACCARINO, and DOES III-V,

      Defendants.

Case No. 2-23-cv-00233-TOR

**DECLARATION OF
MICHAEL C. SUBIT IN
SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT
X CORP.'S MOTION TO
COMPEL ARBITRATION**

DECLARATION OF MICHAEL SUBIT
IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 1
Case No. 2-23-cv-00233-TOR

I, Michael C. Subit, declare a follows:

1. I am a partner at Frank Freed Subit & Thomas LLP and counsel for Plaintiff Arnaud Weber. I am over eighteen years of age, make this declaration based on personal knowledge, and am competent to testify regarding the following facts.

2. Attached as Exhibit A is a true and correct copy of the Cash Award Offer sent by Twitter's Chief People and Diversity Officer Dalana Brand on July 1, 2022.

3. Attached as Exhibit B is a true and correct copy of the Arbitration Demand I sent via certified mail on behalf of Mr. Weber to Twitter's Legal Department on April 10, 2023.

4. I did not receive any response to this Arbitration Demand.

5. Attached as Exhibit C is a true and correct copy of the Demand Letter I sent via certified mail on behalf of Mr. Weber to then-Chief Executive Officer of Twitter, now X Corp., Linda Yaccarino, on June 8, 2023.

6. I did not receive a response to the Demand Letter to Ms. Yaccarino.

7. Attached as Exhibit D is a true and correct copy of the class action complaint in *Woodfield v. Twitter, Inc., et al.*, C.A. No. 1:23-cv-00780-UNA (D. Del. 2023) (ECF No. 1).

DECLARATION OF MICHAEL SUBIT
IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 2
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

8.      Attached as Exhibit E is a true and correct copy of ECF No. 1-4 from the docket in *Ma v. Twitter, Inc., et al.*, Case No. 3:23-cv-3301 (N.D. Cal. 2023).

9.      Attached as Exhibit F is a true and correct copy of ECF 1-5 from the docket in *Ma v. Twitter, Inc., et al.*, Case No. 3:23-cv-3301 (N.D. Cal. 2023).

10.     Attached as Exhibit G is a true and correct copy of the Petition to Compel Arbitration in *Ma v. Twitter, Inc., et al.*, Case No. 3:23-cv-3301 (N.D. Cal. 2023) (ECF No. 1).

I declare under the penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct to the best of my knowledge.

Signed this 5th day of December 2023.


By: *s/Michael C. Subit*
Michael C. Subit, WSBA No. 29189


DECLARATION OF MICHAEL SUBIT
IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 3
Case No. 2-23-cv-00233-TOR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

# EXHIBIT A

July 1, 2022

Arnaud Weber
Via email to: aweber@twitter.com
Employee ID: 023442

Dear Arnaud,

In an effort to show our appreciation for your contributions and impact on Twitter and your dedication to Twitter's success now and beyond, we are providing you with a special cash award as described in this letter ("**Cash Award**"), which will go into effect as of July 1, 2022 (the '**Effective Date**').

**Cash Award.** You will be awarded a one-time cash award of $1,500,000, less applicable withholdings, to be paid in equal installments as follows:

- $375,000 on October 1, 2022
- $375,000 on January 1, 2023
- $375,000 on April 1, 2023
- $375,000 on July 1, 2023

To receive each payment, you must be continuously employed through each payment date to earn and receive the payment. For clarity, if prior to any payment date, your employment with Twitter ends for any reason you will not be eligible to receive any further payments of the Cash Award, and any such installment(s) will be considered unearned and forfeited.

Except as stated above, all other terms and conditions of your employment as set out in your offer letter, including the at-will nature of your employment, will remain unchanged.

Please sign below stating you have reviewed, understand and agree to the changes in this letter. If you have any questions, please reach out to your HRBP.

Thank you for all of your hard work and your continued commitment to Twitter.

Sincerely,

**Twitter, Inc.**

*Dalana Brand*

Dalana Brand
Chief People and Diversity Officer

**Signature:** *Arnaud Weber*
Arnaud Weber (Aug 23, 2022 14:17 PDT)

**Email:** aweber@twitter.com



# EXHIBIT B



April 10, 2023

705 Second Avenue, Suite 1200
Seattle, Washington 98104-1798
P: 206-682-6711
F: 206-682-0401

*Sent by First Class Certified Mail*

Legal Department
TWITTER
1355 Market Street, Suite 900
San Francisco, CA 94103

Michael C. Subit
msubit@frankfreed.com

Re:     **ARNAUD WEBER DEMAND FOR ARBITRATION**

Pursuant to paragraph 4 of his July 19, 2019, Dispute Resolution Agreement, Attachment 1, former Twitter Vice-President of Engineering Arnaud Weber demands arbitration with respect to Twitter's refusal to pay the second $375,000 installment of his July 1, 2022, cash award.

On July 1, 2022, Twitter offered Mr. Weber "a one-time cash award of $1,500,000" effective that date but payable in four equal installments provided Mr. Weber remained continuously employed through each payment date. Attachment 2. The cash bonus was "an effort to show our appreciation for your contributions and impact on Twitter and your dedication to Twitter's success now and beyond…." *Id.* Mr. Weber accepted the offer on August 23. *Id.*

On October 1, 2022, Mr. Weber received the first $375,000 installment of the $1,500,000 cash award. Payment of the second installment of Mr. Weber's cash award was due on January 1, 2023, as Mr. Weber had been continuously employed by Twitter through that date. See Attachment 2. Twitter did not pay the installment. Mr. Weber's employment was terminated on January 4, 2023. Twitter has still not paid the $375,000 due to Mr. Weber on January 1, 2023.

Twitter is in breach of the July 1, 2022, cash award agreement with Mr. Weber. Mr. Weber brings claims against Twitter for breach of contract and violation of the duty of good faith and fair dealing. In the alternative, Mr. Weber brings a claim for promissory estoppel against Twitter with respect to the July 1, 2022, cash award agreement.

Mr. Weber additionally brings a claim against Twitter for violation of RCW 49.48.010. RCW 49.48.010(2) requires all wages due to a discharged employee be paid no later than the end of the next established pay period. That deadline has come and gone.

Furthermore, an employer's refusal to pay compensation due in accordance with the terms of an employment agreement constitutes willful withholding of wages within the meaning of RCW 49.52.070. Mr. Weber also brings a claim against Twitter for violation of RCW 49.52.070. An individual corporate officer, vice-principal, or managing agent faces personal liability under RCW 49.52 for the willful withholding of wages. Mr. Weber demands arbitration against the individuals who willfully withheld his wages under RCW 49.52.070. RCW 49.52.070 provides for an award of exemplary damages comprising double the wages withheld.

Legal Department
TWITTER
April 10, 2023
Page 2

Mr. Weber seeks the following remedies:

1. payment of the $375,000 January 1, 2023, cash award
2. prejudgment interest at 12% per annum from January 1, 2023, to the date of payment
3. double damages and
4. attorneys' fees and costs pursuant to RCW 49.48.030 and RCW 49.52.070.

Sincerely,

Michael C. Subit

MCS/JG
Enclosures:    Attachments 1-2

cc:    Client

# EXHIBIT C



June 8, 2023

705 Second Avenue, Suite 1200
Seattle, Washington 98104-1798
P: 206-682-6711
F: 206-682-0401

*Sent by Certified Mail*

Linda Yaccarino
Chief Executive Officer
TWITTER
1355 Market Street, Suite 900
San Francisco, CA 94103

Michael C. Subit
msubit@frankfreed.com

Re:     **Arnaud Weber**

Dear Ms. Yaccarino:

I represent former Twitter Vice-President of Engineering Arnaud Weber. On March 8, 2023, I wrote a demand letter to Elon Musk regarding Mr. Weber's breach of contract and related unpaid wage claims. I am enclosing a copy of that letter. I received no response.

On April 10, 2023, I transmitted a demand for arbitration on Mr. Weber's behalf to Twitter in accordance with section 4 of his Dispute Resolution Agreement with the Company. I am enclosing a copy of the arbitration demand. Again, we received no response.

If the Company does not respond to the demand for arbitration by the close of business on June 30, we will deem that a waiver of the Company's right to arbitration, and Mr. Weber will pursue his claims against Twitter and the responsible managers in court.

Sincerely,

Michael C. Subit

MCS/jjg
Enclosures:     Demand Letter
                Demand for Arbitration

cc:     Client

DECLARATION OF MICHAEL SUBIT
IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 10
Case No. 2-23-cv-00233-TOR

# EXHIBIT D

Case 2:23-cv-00233-TOR  ECF No. 20-1  filed 12/05/23  PageID.534  Page 2 of 39
Case 1:23-cv-00780-JSCF  Document 42-1  Filed 12/05/23  Page 153 of 902

Case 1:23-cv-00780-UNA  Document 1  Filed 07/18/23  Page 1 of 38 PageID #: 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **CHRIS WOODFIELD, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**TWITTER, INC., X CORP., X HOLDINGS I, INC., X HOLDING CORP., AND ELON MUSK,**<br><br>**DEFENDANTS.** | **C.A. NO. 1:23-**<br><br>**JURY TRIAL DEMANDED** |

1. Plaintiff Chris Woodfield ("Plaintiff" or "Mr. Woodfield") files this Complaint ("Complaint") against Defendants Twitter, Inc. ("Twitter"), X Corp., X Holdings I, Inc. ("X Holdings I"), X Holdings Corp.,1 and Elon Musk ("Musk") (collectively, "Defendants"), and would respectfully show as follows:

## I. INTRODUCTION

2. This action arises out of Defendants' attempts to avoid paying Twitter's ex-employees the severance Defendants promised them – attempts which began with Twitter's refusal to pay the severance it repeatedly promised its employees, and which have morphed, in the months since the employees began to take action to recover what they are owed, into an outright refusal to follow the terms of

---

1 As discussed below, Twitter appears to have merged into X Corp., with X Corp. as the surviving corporation, and X Holdings I appears to have merged into X Holding Corp., with X Holding Corp. as the surviving corporation. Twitter, Inc. and X Holdings I are included as respondents here in an abundance of caution, and references to "Twitter" and "X Holdings I" include the merged successor corporation where appropriate or required.

the Dispute Resolution Agreements ("DRAs") Twitter imposed upon Plaintiff and members of the Class defined below.

3.      Twitter made its promises to pay severance many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

4.      Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

5.      The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

6.      On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

7.      As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and

2

benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

8.  Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

9.  That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was ***not*** what would happen to them if Twitter carried out a layoff after the merger closed.

10.  Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

3

11.    Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

12.    As detailed below, that worked; Plaintiff relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of him decision to remain at Twitter.

13.    On January 4, 2023, after the close of the merger, Plaintiff was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

**II.    Twitter's Breach of the Dispute Resolution Agreement**

14.    Twitter's letter to Plaintiff offering him employment (the "Offer Letter") contained a Dispute Resolution clause which read, in its entirety, as follows:

*15. Dispute Resolution*. We sincerely hope that no dispute will arise between us. If a dispute should arise, it will be resolved through the Company's Dispute Resolution Agreement, unless you choose to opt-out of the same pursuant to its terms. A copy of the Dispute Resolution Agreement is enclosed with this letter.

(emphasis added)

15.    A copy of Twitter's Dispute Resolution Agreement ("DRA"), which provides for arbitration with JAMS, was attached to that offer letter.

16.    Twitter's Offer Letter communicated to Plaintiff that executing the DRA was a condition of employment.

17.    Plaintiff signed the DRA through Adobe's Adobe Sign process prior to beginning his employment.

4

18.     Despite a diligent search, Plaintiff was unable to locate his countersigned DRA prior to commencing his arbitration with JAMS on May 6, 2023.

19.     In the absence of his countersigned DRA, Plaintiff included the copy of his DRA that bore Twitter's signature but not his own when he filed his Demand for Arbitration (the "Demand").

20.     In his Demand, Plaintiff affirmatively pleaded that he had signed the DRA but was unable to locate his own countersigned copy.

21.     On May 23, 2023, Defendants objected to Plaintiff's demand for arbitration on the basis that the DRA drafted and executed by Twitter, in which Twitter specified JAMS as the sole arbitration provider for any disputes between Plaintiff and Twitter, was not sufficient to allow JAMS to take jurisdiction over Plaintiff's dispute.

22.     Defendants did not contend that no signed DRA exists.

23.     Defendants did not affirm that they diligently searched their files for Plaintiff's DRA.

24.     Defendants did not affirm that they were unaware of the location of Plaintiff's DRA, were unable to find it, or had any doubts whatsoever as to its existence or contents.

25.     Indeed, Defendant Twitter had previously affirmatively represented to another federal court that it maintained a copy of each employee's DRA in its files.

26.     In support of that representation, Twitter submitted a declaration that laid out, in excruciating detail, the process by which Twitter ensured that it maintained a file copy of the DRA executed by every employee who received an offer of employment contingent on the execution of a DRA, such as Plaintiff.

27.     At the time Twitter objected to JAMS taking jurisdiction over the arbitration, Twitter was fully aware that Plaintiff's DRA, which explicitly provided for arbitration with JAMS, was in its files, and that it was obligated to arbitrate with Plaintiff at JAMS.

5

28. Defendants refused to live up to that obligation.

29. Although Plaintiff affirmatively plead that he had signed the DRA, Twitter maintained that Plaintiff does not have the right to commence arbitration on the grounds that, although Plaintiff provided a copy of the DRA bearing *Twitter's* signature, he did not submit a copy that bore *his own* signature.

30. Defendants' actions are in breach of their explicit obligation to arbitrate under the DRA.

31. Defendants' actions are in breach of the implied duty of good faith that is an implicit term of the DRA.

32. Defendants having thus breached the DRA and, therefore, waived their right to arbitrate, Plaintiff has chosen to bring his dispute to Court.

## III.  PARTIES

33. Plaintiff Woodfield is a former Twitter employee residing in Washington. While employed at Twitter, Plaintiff worked at Twitter's Seattle office.

34. Defendant Twitter was a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103. Upon information and belief, Twitter has since merged into Respondent X Corp., a Nevada corporation, with X Corp. as the surviving entity.

35. Defendant X Holdings I was a Delaware corporation. Upon information and belief, X Holdings I has since merged into X Holding Corp., a Nevada corporation, with X Corp. as the surviving entity.

36. Defendant Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

6

## IV.          FACTUAL BACKGROUND

### A. Plaintiff Was a Dedicated Twitter Employee

37.   Plaintiff was employed by Twitter as a Senior Staff Network Engineer.

38.   Plaintiff worked for Twitter from April 2011 through November 2016, then left and returned in 2020.

39.   For his most recent stint at Twitter, Plaintiff accepted his position with Twitter on or about April 13, 2020, began work on or about May 18, 2020, and remained continuously employed by Twitter until he was laid-off on January 4, 2023.

40.   Twitter made several promises to Plaintiff during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

41.   Other promises were made more recently, including promises that, Plaintiff would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

42.   These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

### B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply with the Terms of the Agreement He Voluntarily Entered

43.   Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

44.   Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

7

45.   Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

46.   During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

47.   He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

48.   On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

49.   Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

50.   Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

51.   He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

52.   After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

53.   Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

54.   On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

55.   On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

56. On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

57. After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

58. On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

59. The deal closed on October 27.

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

60. With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

61. Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

62. It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

63. These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

64. Twitter took these concerns very seriously.

65. If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

9

66.     The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

67.     Twitter therefore took several steps to reassure its employees.

68.     First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

69.     The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

70.     That clause read as follows, in full:

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall*

10

> *provide, or shall cause the Surviving Corporation or any of*
> *their Affiliates to provide severance payments and benefits to*
> *each Continuing Employee whose employment is terminated*
> *during such period that are no less favorable than those*
> *applicable to the Continuing Employee immediately prior to*
> *the Effective Time under the Company Benefit Plans.*

(emphasis added).

71.    And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

72.    Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

73.    On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

74.    Moreover, the Severance Stability Promise provided benefits to all involved.

75.    Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

76.    Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

77. And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

78. Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

79. Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

80. The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

81. It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

82. After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

83. Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

84. In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

85. Plaintiff in fact learned that information from Twitter.

86. These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

87. After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

12

88.    When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

89.    In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

90.    On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

91.    The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o    Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o    Pro-rated Performance Bonus Plan compensation at target

    o    Cash value of equity that would have vested within three months from the separation date

    o    A cash contribution for health care continuation.

(bullet points in original).

92.    The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

93.    Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

94.     On October 24, 2022 – just two days before the deal closed --
        Twitter again repeated the same statement to employees regarding
        severance.

95.     On information and belief, Twitter made these statements to
        reassure employees and to induce them to remain at Twitter in
        order to provide a stable set of conditions going into the
        acquisition.

96.     On information and belief, Twitter expected that employees would
        rely upon these statements as a reason to remain at Twitter, and to
        refrain from seeking new employment during the pre-acquisition
        period.

97.     It was reasonable for employees to rely upon these explicit
        representations. The Merger Agreement contained explicit
        provisions relating to severance. Twitter's additional
        representations outlined what that severance would consist of, and
        were made in response to questions that explicitly asked what the
        existing severance package consisted of.

98.     Plaintiff did, in fact, rely upon these representations.

99.     The promised severance in fact factored into Plaintiff's decision to
        remain at Twitter through the closing of the merger.

100.    To put it simply, Plaintiff was aware that he had a safety net if
        Musk came in and did a mass layoff or even targeted firings: if
        terminated, he would receive a significant sum as a severance
        payment, which would help provide him time to find a new job
        without severe economic pressure.

101.    Indeed, Plaintiff turned down an offer of other employment in the
        summer of 2022. Had he known that Twitter and Musk would
        break their promise of severance, he would not have remained at
        Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations
   Under the Merger Agreement**

102.    On October 26, 2022, Musk took over as the owner of Twitter.

14

103. On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

104. On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

105. On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

106. In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

107. In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

108. Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

109. On information and belief, this occurred in some cases within hours of the takeover.

110. On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

111. Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

112. On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

113. On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

114. The next day, roughly half of Twitter's workforce, including Plaintiff, were laid off.

15

115.   The email informing the affected employees that they had been
       terminated outlined a planned severance package of far less than
       what Twitter had repeatedly promised – and contractually agreed –
       to pay.

116.   Specifically, the email advised the employees that "[t]he Company
       is offering a severance package of one month base pay (or OTE for
       commission-based employees) to eligible impacted employees."

117.   But the layoffs did not stop there. Over the next several days,
       Twitter fired further employees, informing them that Twitter had
       deemed them in violation of some unnamed Twitter policy.

118.   These purported "for cause" terminations were clearly pretextual,
       and constituted further layoffs.

119.   In the same time-frame, and consistent with conversations Musk
       had in advance of closing on the merger in which he discussed
       making changes to employee working conditions in order to induce
       resignations, Musk then announced that Twitter would be ending
       its remote work policy and immediately require all workers to
       report to work at a physical Twitter office.

120.   He did so despite Twitter employing workers who lived (and
       worked remotely) many hours or even hundreds of miles from the
       nearest Twitter office.

121.   Musk soon updated the policy, indicating that Twitter would
       "allow" a transition period for remote workers who lived too far
       from an office to feasibly commute to move to a location closer to
       the Twitter offices.

122.   Later, the policy morphed into one in which managers could allow
       their reports to work remotely if they chose to – but would
       themselves be fired if the employees they allowed to work from
       home did not perform up to Musk's standards.

123.   As intended, this change to Tweeps' conditions of employment
       triggered a wave of resignations.

124.   But that wasn't enough. In mid-November, Musk sent another
       email, with a link to an online form and an ultimatum: Any Twitter

employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

125.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

126.    And yet again, that still wasn't enough.

127.    After the November 17 layoff, Musk brought in engineers from his other companies – including Tesla, Inc. ("Tesla") and the Space Exploration Technologies Corporation ("SpaceX") –  among others, to conduct "code reviews" of code written by Twitter employees.

128.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

129.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

130.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

131.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were

17

performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

132. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

133. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

134. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

135. On information and belief, Musk routinely violates agreements as a matter of policy in an that would require him to expend money apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

136. In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

**E. Twitter's Pattern of Delay**

137. Plaintiff, of course, is not alone in his efforts to hold Defendants responsible for their disregard of their contractual obligations.

138. As of the filing of this Complaint, Plaintiff's former colleagues have brought more than two thousand demands for arbitration, beginning in December 2022.

18

139. However, on information and belief, fewer than three hundred of these arbitrations have been commenced.

140. The rest of these demands have languished in a dispute resolution no-man's-land, unable to move forward in a speedy and efficient manner due to Defendants' persistent and intentional efforts to delay the proceedings at every stage.

141. These efforts begin as soon as demands are filed.

142.  Although the DRA requires the parties to arbitrate "according to the then-current JAMS rules," which state that the case-initiation fees are due upon receipt of the JAMS-issued invoice, Defendants delay payment of those fees for weeks or months.

143. As a result, rather than moving efficiently into arbitration, claimants are forced to cool their heels before their case can even commence.

144. Defendants do not only delay the payment of the case initiation fees, however. They also delay the payment of incremental deposits required throughout the arbitration, again by a period of several weeks, meaning that the arbitration process grinds to a halt every time these fees are assessed.

145. This is, of course, presuming that Defendants even consent to JAMS' jurisdiction in the first place.

146. Defendants are aware – and, indeed, have affirmatively represented to the Court – that every employee hired since at least March 2013 has signed a DRA as a condition of their employment with Twitter.

147. In fact, Twitter's policy of requiring employees to sign a DRA upon hire dates back to at least March 2013.

148. Defendants are aware, and have affirmatively represented to the Court, that Twitter maintains copies of fully executed DRAs within its files.

149. Defendants have relied on the existence of these DRAs to compel its former employees into arbitration rather than litigating its claims in open court.

19

150. Yet, when it comes time to actually proceed into arbitration, Defendants' willingness to rely on the DRAs in their possession evaporates.

151. For example, every employee hired since June of 2018 has signed a DRA that specifies JAMS as the arbitration provider. Nonetheless, Defendants will not stipulate to JAMS's jurisdiction over these arbitration demands unless Tweeps provide *their* copy of the DRA.

152. Furthermore, Tweeps' attempts to recover their DRAs from Twitter result in a wild goose chase out of a Benny Hill episode.

153. Twitter provided an email address (peoplequestions@twitter.com, or "PeopleQuestions") for employees to contact the company, but it is not a reliable way to get information.

154. Messages sent to PeopleQuestions go unanswered more often than not, even when questions are urgent.

155. Indeed, when Tweeps email PeopleQuestions with a request for their DRA, they get – at best – a seemingly-automated reply that advises further response in 3-5 business days.

156. That response typically never comes.

157. But incredibly, Defendants' bad faith delay extends even farther.

158. Plaintiff **had** a copy of his DRA – the pre-execution version, signed by Twitter, that had been included in his offer letter.

159. The post-execution version, signed by both Twitter and Plaintiff, was safely tucked away by Twitter in its files.

160. Plaintiff knows he signed his DRA, and affirmatively pleaded that fact in his demand for arbitration.

161. Twitter knows Plaintiff signed his DRA; after all, it represented to the Northern District of California that he would not have been able to start his job otherwise and that it maintained files on all DRAs signed since at least September 2017, prior to Plaintiff's hire.

20

162. Plaintiff knows Twitter knows Plaintiff signed his DRA.

163. In fact, Twitter knows Plaintiff knows Twitter knows Plaintiff signed his DRA.

164. But despite the fact that everyone knows that there is a valid DRA between the parties, Defendants did not move forward in a manner consistent with their agreement to arbitrate.

165. Rather, they requested that JAMS deny jurisdiction – an action clearly and unmistakably inconsistent with their agreement to arbitrate – in an attempt to introduce one more period of delay.

166. Moreover, though the DRA provides for arbitration with JAMS and pursuant to JAMS' Rules – which require Defendants to pay the costs of the arbitration without allocating fees to Plaintiff – and though the DRA contains no contrary agreement by Plaintiff to share fees, Defendants recently informed JAMS that they would not proceed with *any* arbitration in which JAMS required Twitter to bear the arbitration fees unless applicable state law *also* required them to do so.

167. To that end, Defendants expressly demanded that JAMS close and refuse to administer any arbitrations filed with JAMS by Claimants located in Washington state, among others.

168. Defendants have thus *also* repudiated their obligation to arbitrate with Plaintiff at JAMS.

169. Plaintiff has had enough. He accepts Defendants' waiver of their right to arbitrate his dispute, and accordingly brings this action in court.

## V.   VEIL PIERCING ALLEGATIONS

170. There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

171. Musk, through X Holdings I, owns more than 50% of Twitter.

172. Musk dominates Twitter's decision-making and operations.

21

173. For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

174. Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

175. Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

176. At Musk's direction, Twitter restored Anglin's account.

177. Twitter has engaged in other content moderation decisions at Musk's whims.

178. For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

179. After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

180. Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

181. On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

182. On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

183. On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

184. Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

22

185.   On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

186.   On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

187.   Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

188.   As such, Musk should be personally liable for any amounts awarded on the claims alleged herein.

## VI.   CLASS ACTION ALLEGATIONS

189.   Plaintiff brings these causes of action on behalf of himself and on behalf of the following proposed class ("Class"):

> All Twitter employees who were laid off on or around November 4, 2022 through October 31, 2023.

190.   With respect to Cause of Action 1: Breach of the DRA, Plaintiff brings this action only on behalf of the proposed subclass ("DRA Subclass"):

> All Twitter employees who were laid off on or around November 4, 2022 through October 31, 2023 with whom Twitter has a DRA Defendants have indicated they will breach, *inter alia*, deliberately delaying the arbitrations and refusing to pay arbitral fees as required by the DRA and the rules of JAMS and the American Arbitration Association.

191.   This action is appropriately suited for a class action because:

192.   <u>Numerosity and Ascertainability.</u>  Upon information and belief, the proposed Class and Subclasses include over forty former Twitter employees, and therefore joinder of all individual Class members would be impractical.

193.   <u>Predominant Common Questions of Law and Fact.</u>  Common questions of law and fact affecting the rights of all Class members predominate over individualized issues.  Defendants' liability is

23

based on their decision to not pay laid-off employees the previously promised severance package, which it represented would include at least two months of base salary or On Target Earnings for employees on the Sales Incentive Plan; pro-rated Performance Bonus Plan compensation at target; cash value of equity that would have vested within three months from the separation date; and cash contribution for health care continuation. Common questions include, but are not limited to:

194.   Whether Defendants breached the DRA by, among other things, failing to advance, and refusing to pay, contractually agreed upon arbitration fees and costs for all DRA Subclass members;

195.   Whether Defendants breached the Merger Agreement by refusing to pay the Severance Benefits outlined therein;

196.   Whether Defendants breached their oral contract by refusing to pay the Severance Benefits outlined in the Merger Agreement;

197.   Whether Defendants breached Class members' offer letters by refusing to pay Severance Benefits in accordance with the terms of their Offer Letters which required them to pay all benefits of employment;

198.   Whether Defendants Musk, X Holdings I, or X Holdings II committed fraud by entering into the Merger Agreement with the intent to break the Severance Stability Promise;

199.   Whether Defendants violated WARN by failing to provide the Class members all benefits of employment for the required ninety-day notice period;

200.   Whether there is a unity of interest and ownership between Defendant Twitter and Musk such that Defendant Musk may be found personally liable for the Causes of Action hereinafter alleged;

201.   The proper measure of damages sustained by members of the Class; and

202.  Whether Defendants' affirmative defenses, if any, raise any
      additional common issues of law or fact as to Plaintiff and the
      Class members.

203.  <u>Typicality.</u>  Plaintiff's claims are typical of the claims of the Class
      as a whole because Plaintiff and the Class were subject to
      Defendants' universal decision to fail or refuse to provide the
      contracted-for and promised severance pay in violation of the law.
      Plaintiff's claims are typical of the DRA Subclass because Plaintiff
      and the DRA Subclass were subject to Defendants' universal
      decision to comply with their obligation to comply with arbitrator-
      specific rules in accordance with DRA.

204.  <u>Adequacy of Representation.</u>  Plaintiff will fairly and adequately
      represent the interests of the Class because his individual interests
      are consistent with, and not antagonistic to, the interests of the
      Class. Plaintiff has retained counsel who have the requisite
      resources and ability to prosecute this case as a class action.
      Counsel for Plaintiff are experienced attorneys who have
      successfully litigated other cases involving similar issues,
      including breach of contract and fraud.

205.  This suit is properly maintained as a class action under Fed. R.
      Civ. P. 23 because Defendant failed or refused to pay promised
      severance when it terminated Plaintiff and the Class members.
      Class treatment is superior to alternative methods to adjudicate this
      dispute because Plaintiff and the similarly situated laid-off
      employees suffered similar treatment and harm as a result of a
      universal decision made by Twitter to fail or refuse to pay
      promised severance payments at the time of termination.  This suit
      is also properly maintained as a class action because the common
      questions of law and fact predominate over any questions affecting
      only individual members of the Class.  For these and other reasons,
      a class action is superior to other available methods for the fair and
      efficient adjudication of the controversy set forth herein.  Class
      certification is also superior because it will obviate the need for
      unduly duplicative litigation which might result in inconsistent
      judgments about Defendants' practices.

## VII. CAUSES OF ACTION

### A. Count One (against Twitter and X Holdings I): Breach of Contract (DRA) (Brought by Plaintiff on Behalf of Himself and the DRA Subclass)

206. Plaintiff restates and realleges each paragraph above as if fully stated herein.

207. Plaintiff and the DRA Subclass each executed DRAs with Twitter, which detailed the procedure by which any dispute with Twitter would be resolved.

208. The DRAs executed by Plaintiff and the DRA Subclass members are substantially similar and contain the following relevant provisions or similar language that contained with Plaintiff's DRA:

209. The DRAs state that they apply, "without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim."

210. The DRAs also state that "[t]his Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial."

211. The DRAs also provide that all claims will be brought before JAMS, "pursuant to the then-current JAMS Rules."

212. The JAMS Employment Arbitration Rules state, in relevant part, that JAMS will commence arbitration based upon the existence of

26

"[a] pre-dispute written contractual provision requiring the Parties to arbitrate the employment dispute or claim and specifying JAMS administration or use of any JAMS Rules or that the Parties agree shall be administered by JAMS."

213.  The DRAs are pre-dispute written contracts requiring the parties to arbitrate all employment disputes or claims.

214.  The post-June 2018 DRAs specify JAMS administration and the use of the JAMS rules.

215.  Plaintiff fulfilled all of the required conditions for JAMS to assert jurisdiction over Plaintiff's dispute with Twitter and commence arbitration were met by the copy of Plaintiff's DRA he submitted to JAMS, even in the absence of his signature.

216.  Even were they not, Twitter was obligated by the DRA to consent to arbitration at JAMS, whether by providing its copy of the DRA from its files or by simply paying the case initiation fee and answering Plaintiff's arbitration demand without objecting to jurisdiction. Twitter breached the DRAs by asking JAMS to decline jurisdiction over Plaintiff's dispute after he fulfilled the conditions for commencement.

217.  Twitter's objection to JAMS' jurisdiction was fundamentally inconsistent with its agreement to arbitrate at JAMS.

218.  Additionally, because Twitter required its employees to execute the DRAs as a condition of employment, JAMS' rules require Twitter to pay 100% of the arbitration fees for arbitrations filed by its employees.

219.  Twitter agreed in the DRA to abide by JAMS' rules.

220.  Nevertheless, Twitter has informed JAMS that it will not pay the required fees for employees located in states other than California, and demanded that JAMS terminate the arbitrations filed by employees from such states.

221.  As part of that demand, Defendants made clear that they would not arbitrate with any employee who was unwilling to voluntarily contribute 50% of the arbitration fees.

222. In so doing, Twitter breached its DRA with each employee who already filed for arbitration with JAMS.

223. And by announcing that as a policy matter Defendants will not arbitrate with its employees, Defendants anticipatorily breached each DRA providing for arbitration at JAMS.

224. Defendants similarly anticipatorily breached each pre-June 2018 DRA.

225. Twitter's pre-June 2018 DRAs did not identify a particular arbitration provider before whom claims could be commenced.

226. On April 27, 2023, Defendants agreed that former Twitter employees who executed pre-June 2018 DRAs and were clients of undersigned counsel could bring their claims with the American Arbitration Association ("AAA").

227. Like JAMS, AAA rules require Defendants to pay for 100% of the costs of any such arbitration.

228. As such, Defendants' refusal to arbitrate unless Claimants pay 50% of the arbitral fees is also an anticipatory breach of the pre-June 2018 DRAs.

229. As such, Plaintiff and the DRA Subclass members are entitled to a declaration that Twitter has waived its right to arbitrate disputes with Plaintiff and the DRA Subclass members, that Twitter cannot enforce the DRA terms, including the class action waiver contained therein, and damages in an amount to be proven at trial.

**B. Count Two (against Twitter and X Holdings I): Breach of Merger Agreement (Brought by Plaintiff on Behalf of Himself and the Class)**

230. Plaintiff restates and realleges each paragraph above as if fully stated herein.

231.   Plaintiff and the Class members are intended third-party beneficiaries[2] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

232.   Twitter has breached the Merger Agreement by refusing to pay Plaintiff and the Class members the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

233.   X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Plaintiff and the Class members the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

234.   As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

### C. Count Three: (against Twitter) Breach of Oral Contract (Brought by Plaintiff on Behalf of Himself and the Class)

235.   Plaintiff restates and realleges each paragraph above as if fully stated herein.

236.   The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current

---

[2] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Plaintiff *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Plaintiff will provide in briefing if and as necessary. Plaintiff raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

29

benefits in exchange for each employee's remaining employed at Twitter through the merger.

237. Plaintiff and the Class members accepted that offer by continuing to work at Twitter instead of seeking alternative employment.

238. Plaintiff and the Class members provided Twitter with consideration for its promise by continuing to work at Twitter through that period until they were laid off.

239. As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Plaintiff and the Class members with the severance outlined in the Severance Policy Email, which they fully performed.

240. Twitter has breached this agreement by refusing to pay Plaintiff and the Class members the severance outlined in the Severance Policy Email and diminishing the benefits it made available to them.

241. As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D. Count Four (in the alternative, against Twitter): Promissory Estoppel (Brought by Plaintiff on Behalf of Himself and the Class)**

242. Plaintiff restates and realleges each paragraph above as if fully stated herein.

243. To the extent that Twitter's communications and Plaintiff's subsequent conduct did not create an enforceable contract with Plaintiff and the Class members, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

244. The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

245. Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

246. It was reasonable for Plaintiff and the members of the Class to rely upon that promise.

247. Plaintiff and the Class members did in fact rely upon that promise.

248. Plaintiff and the Class members were damaged by that reasonable reliance, in that it negatively impacted their ability to find alternative employment in advance of the merger.

249. Twitter's promise to provide Plaintiff and the Class members with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Plaintiff with such severance.

250. As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**E. Count Five (against Twitter): Breach of Offer Letter (Brought by Plaintiff on Behalf of Himself and the Class)**

251. Plaintiff restates and realleges each paragraph above as if fully stated herein.

252. Plaintiff and the Class members each executed offer letters with Twitter, which detailed the terms of their employment (the "Offer Letters").

253. The Offer Letters constitute binding contracts between Twitter and Plaintiff and the members of the Class.

254. The Offer Letters provide that Plaintiff and the Class members will be eligible to receive benefits under the terms of Twitter's benefits plans.

255. Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Plaintiff and the Class members were entitled to receive the benefit of when Twitter terminated Plaintiff and the Class members.

31

256. Indeed, on information and belief, the severance policy as set out in the Severance Policy Email was documented in other ways, including in a severance "Matrix" reflecting Twitter's actual severance policy.

257. Twitter did not provide Plaintiff and the Class members with severance in accordance with its benefit plan.

258. As such, Twitter breached the Offer Letters, and Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**F. Count Six (against all Respondents): Fraud (Brought by Plaintiff on Behalf of Himself and the Class)**

259. Plaintiff restates and realleges each paragraph above as if fully stated herein.

260. In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

261. Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

262. In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

263. On information and belief, Musk personally approved many of Twitter's communications with its employees regarding the Merger Agreement and the protections it offered the employees.

264. Twitter has now affirmatively argued to this Court that the Merger Agreement was never intended to provide the employees with the protection Twitter represented to the employees were contained in the Merger Agreement.

32

265.   Upon information and belief, Musk and X Holdings I each ratified and approved that argument.

266.   Upon information and belief, Musk and X Holdings I never intended for the Merger Agreement to provide Twitter's employees with the protections Twitter represented to the employees were contained in the Merger Agreement.

267.   Upon information and belief, at the time he approved Twitter's communications to employees, Musk did not believe that the Merger Agreement offered employees the protection of their severance that those communications described to them.

268.   On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

269.   Plaintiff and the Class members relied upon these representations.

270.   On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

271.   Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

272.   On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

273.   When it laid off Plaintiff and members of the Class, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

274.   As a result of Respondents' fraud, Plaintiff and members of the Class suffered damages.

275. As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, but which are reasonably believed to exceed $500,000,000.00, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

276. In addition, Plaintiff and the Class members are entitled to an award of punitive damages.

**G. Count Seven: WARN Act Violations (29 U.S.C.A. § 2101 et seq.) (Brought by Plaintiff on Behalf of Himself and the Class)**

277. Plaintiff restates and realleges each paragraph above as if fully stated herein.

278. The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

279. On information and belief, Twitter's layoffs meet all statutory requirements for a mass layoff under the WARN Act.

280. In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Plaintiff and the Class members.

281. Instead, Twitter designated a period of 60 or 90 days as a period during which Plaintiff and the Class members would remain employed but in a 'nonworking' status.

282. However, Twitter has failed to continue to provide the laid-off employees (including Plaintiff and the Class members) with their full benefits provided to other employees during this period and is thus in violation of the WARN Act.

283. For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

284. Twitter also provided other "annually refreshing" benefits to its employees.

285. Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees,

34

including Plaintiff and the Class members, despite those
employees continuing to be employed by Twitter on January 1,
2023.

286. Twitter informed laid-off employees who inquired about those
benefits that "[e]xpenses related to productivity, wellness, phone,
or wifi expenses and learning allowance reimbursement during the
Non-Working Notice period window are not permitted."

287. As a result of Twitter's violation of the WARN Act, Plaintiff and
the Class members are entitled to damages to be proven at hearing,
including Plaintiff's and the Class member's benefits for the "Non-
Working Notice period window" to which Plaintiff and the Class
members were entitled, statutory WARN Act penalties, and pre-
and post-judgment interest, costs, and attorneys' fees as authorized
by statute.

**H. Count Eight: Employment Discrimination (42 U.S.C § 2000e, Cal.
Government Code § 12940 et seq., RCW 49.60.030 and 49.60.180(2)
(Brought by Plaintiff)**

288. Plaintiff restates and realleges each paragraph above as if fully
stated herein.

289. Both state and federal law bar Twitter from discriminating on the
basis of race, sex, gender, family status, disability, age, and other
grounds.

290. For instance, Section 12940 of the California Government Code
bars any California employer from engaging in employment
discrimination, while 42 U.S.C. § 2000e bars employment
discrimination at the federal level.

291. In addition, Washington antidiscrimination laws, including RCW
49.60.030 and 49.60.180(2), similarly prohibit discrimination in
employment.

292. Despite those laws, the anecdotal evidence currently available to
Plaintiff indicates that Twitter likely conducted its mass layoff on a
discriminatory basis.

35

293. Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

294. Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

295. Compounding these warning signs, Twitter has refused to respond to Plaintiff's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Plaintiff to confirm or rebut the picture painted by the available anecdotal information.

296. Plaintiff is an older employee.

297. On information and belief, Plaintiff was included in the mass layoff because he is an older worker.

298. The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

299. As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Plaintiff is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## I. Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft (Brought by Plaintiff)

300. Plaintiff restates and realleges each paragraph above as if fully stated herein.

301. Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

302. Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

36

303. Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

304. Under both Washington and California law, Plaintiff may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

305. Twitter's choice to pay Plaintiff less than the severance guaranteed to him under the Severance Stability Promise was made willfully, with the intent to deprive Plaintiff of his rightful wages, in violation of RCW 49.52.050(2).

306. Under Washington law, Plaintiff is entitled to treble damages.

307. As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Plaintiff's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## VI.   REQUEST FOR RELIEF

308. Wherefore, Plaintiff Woodfield respectfully asks this Court:

    a.   For an order certifying this as a class action;

    b.   For an order appointing Plaintiff as the class representative and Plaintiff's counsel as the Class and DRA Subclass counsel;

    c.   For an order declaring that Defendants breached the DRA as to the DRA Subclass;

    d.   For compensatory damages, including but not limited to, unpaid severance wages, plus interest, according to proof allowed by law;

    e.   For liquidated damages allowed by law;

    f.   For an award of pre-judgment and post-judgment interest;

DECLARATION OF MICHAEL SUBIT
IN SUPPORT OF PLAINTIFF'S
RESPONSE TO DEFENDANT X CORP.'S MOTION
TO COMPEL ARBITRATION - 48
Case No. 2-23-cv-00233-TOR

g.  For preliminary and permanent injunctive relief enjoying Defendant from engaging in the unlawful and unfair practices alleged herein;

h.  For a reasonable service payment to the Plaintiff Woodfield for his services for the benefit of the Class and DRA Subclass;

i.  For such other and further relief that the Court may deem just and proper.

Dated: July 18, 2023              Respectfully submitted,

*/s/ Joseph L. Christensen*

Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

Akiva Cohen (*pro hac vice forthcoming*)
Lane Haygood (*pro hac vice forthcoming*)
Dylan M. Schmeyer (*pro hac vice forthcoming*)
Michael D. Dunford (*pro hac vice forthcoming*)
KAMERMAN, UNCYK, SONIKER, & KLEIN, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
lhaygood@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

*Attorneys for Plaintiffs*

38

# EXHIBIT E



NOTICE TO ALL PARTIES                                                          June 21, 2023

       RE:    **Twitter Inc.'s Request For Fee Sharing**

Dear Parties:

JAMS has received and reviewed Twitter's June 2 request for equal apportionment of JAMS fees in arbitrations pending in certain jurisdictions, and the several responses thereto from counsel for Claimants.

JAMS notified the parties at the outset of these matters that the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards" or "Standards") applies.  The Minimum Standards reflect JAMS administrative policy to administer employment arbitrations under the protections provided in the Minimum Standards.  Application of the Standards is separate and apart from the protections that may apply in any given jurisdiction, and JAMS applies the Standards nationwide.   While the Minimum Standards might go further than the law requires in a particular jurisdiction, JAMS has chosen to conduct its business in a manner which provides these protections for employees where the arbitration agreement is not negotiated and is required as a condition of employment.  As our notice at the outset of each case advised, JAMS applies the Minimum Standards notwithstanding any contrary provision in the parties' arbitration agreement (unlike the JAMS Rules, which are subject to party-agreed procedures consistent with JAMS Rule 2).

The Minimum Standards do not prevent an employee from contributing to JAMS fees (see the Comment under Standard No. 6).  However, absent employee agreement JAMS will continue to issue invoices in these matters consistent with Standard No. 6.

Where JAMS has determined the Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration.

As our notice in each case advised, any further issue about whether the Minimum Standards apply in a given case should be directed to the arbitrator in the case.  After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly.  JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination.

Twitter Inc.'s Request For Fee Sharing
June 20, 2023
P a g e | **2**

Sincerely,

*/s/ Sheri Eisner*

Sheri Eisner
Senior Vice President, General Counsel
Co-Chair, JAMS National Arbitration Committee

# EXHIBIT F

# Morgan Lewis

**Sari M. Alamuddin**
Partner
+1.312.324.1158
sari.alamuddin@morganlewis.com

June 28, 2023

**VIA EMAIL**

Sheri Eisner
Senior Vice Present, General Counsel
Co-Chair, JAMS National Arbitration Committee

Re:    Twitter, Inc's Response to JAMS' June 21, 2023 Letter

Dear Ms. Eisner:

On behalf of X Corp. as success-in-interest to Twitter, Inc. (collectively, hereinafter "Twitter"), we write in response to your letter dated June 21, 2023.

As we explained in our June 2, 2023 letter to JAMS, both JAMS' Minimum Standard No. 6, and any decision by JAMS that it will make the final determination on this Standard's application to these cases, conflict with the express, unambiguous and controlling terms of the applicable dispute resolution agreements between the parties.  We accordingly sought clarification from JAMS as to its understanding of the application of these principles in these matters.  In JAMS' letter dated June 21, 2023, JAMS decided (1) that it would apply the Minimum Standards "notwithstanding any contrary provision in the parties' arbitration agreement"; (2) where it "has determined that Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration"; and (3) if an individual arbitrator believes that JAMS should revisit the issue, JAMS may take that into consideration but ultimately JAMS "will make a final determination."

JAMS' decision prevents Twitter from exercising its contractual rights and improperly negates a material provision in the dispute resolution agreements should Twitter proceed in accordance with that decision.  For this reason and based upon JAMS' recent June 21 determination, Twitter declines to proceed under the Minimum Standards for all demands in jurisdictions where fee-sharing is lawful.  Attached to this letter is a list of demands against Twitter currently filed with and/or pending before JAMS in such jurisdictions.  We understand that, in accordance with your June 21 letter, JAMS will no longer administer these arbitrations.  As a result, JAMS should cease invoicing Twitter for any fees/costs associated with these arbitrations.

Please let us know if you have any questions.  Counsel for claimants is copied on this letter.

**Morgan, Lewis & Bockius LLP**

110 North Wacker Drive
Chicago, IL  60606-1511
United States
**T** +1.312.324.1000
**F** +1.312.324.1001

Sheri Eisner
June 28, 2023
Page 2

Sincerely,


/s/


Sari M. Alamuddin

SMA
Attachment
c:  Dixon Diab & Chambers LLP
    Outten & Golden LLP
    Lichten & Liss-Riordan P.C.
    Kamerman, Uncyk, Soniker & Klein, P.C.

# EXHIBIT G

1 | SHANNON LISS-RIORDAN (SBN 310719)
  | (sliss@llrlaw.com)
2 | THOMAS FOWLER (*pro hac vice* forthcoming)
  | (tfowler@llrlaw.com)
3 | BRADLEY MANEWITH (*pro hac vice* forthcoming)
  | (bmanewith@llrlaw.com)
4 | LICHTEN & LISS-RIORDAN, P.C.
5 | 729 Boylston Street, Suite 2000
  | Boston, MA 02116
6 | Telephone:    (617) 994-5800
7 | Facsimile:    (617) 994-5801

8 | *Attorneys for Plaintiff Fabien Ho Ching Ma,*
9 | *on behalf of himself and all others similarly situated*

10 |
   | **UNITED STATES DISTRICT COURT**
11 | **NORTHERN DISTRICT OF CALIFORNIA**
   | **SAN FRANCISCO DIVISION**
12 |

13 | FABIEN HO CHING MA, on behalf of himself | Case No. 3:23-cv-3301
14 | and all others similarly situated,
15 |                          Petitioner,
16 |            v.                                    | **PETITION TO COMPEL ARBITRATION**
17 | TWITTER, INC., AND X CORP.,                    | 1.  FEDERAL ARBITRATION ACT,
18 |                          Respondents.           |     9 U.S.C. § 4
19 |
20 |

21
22
23
24
25
26
27
28

PETITION TO COMPEL ARBITRATION

Petitioner files this Petition for an Order compelling Respondents Twitter, Inc. and X Corp. (collectively, "Twitter") to arbitration as follows:

**NATURE OF THE PETITION**

1.       Petitioner Fabien Ho Ching Ma, on his own behalf and on behalf of other similarly situated former Twitter employees with whom Twitter has refused to engage in arbitration — despite having compelled employees to arbitrate their claims — files this Petition to Compel Arbitration against Twitter, pursuant to the terms of the arbitration agreements signed by the parties.

2.       Since Elon Musk's acquisition of Twitter in October 2022, the company has been accused of a variety of unlawful acts, including failing to pay laid off employees promised severance payments, discriminating against employees on the basis of sex, race, age, and disability, failing to pay promised bonuses, violating the WARN Act and FMLA, and other violations.  Approximately 2,000 of Twitter's former employees have attempted to pursue arbitration claims against the company, following Twitter's successfully moving to compel arbitration in several federal class action cases in court against it.

3.       Petitioner and these thousands of other former Twitter employees signed nearly identical arbitration agreements that state that they are applicable to any disputes arising from or related to their employment with Twitter or separation of their employment.  *See* Exhibit A (Petitioner's arbitration agreement).

4.       The majority of these agreements provide that the parties agree to bring any claims in arbitration before Judicial Arbitration and Mediation Services ("JAMS"), an arbitration service provider, pursuant to the then-current JAMS Rules.

5.       JAMS Rules include a provision stating that, whenever parties have provided for arbitration by JAMS, the parties shall be deemed to have incorporated JAMS Rules as a part of their arbitration agreement. The Rules further provide that any other agreements the parties may make with respect to procedures for employment-related arbitrations must comport with the

1
PETITION TO COMPEL ARBITRATION

1  JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS

2  Minimum Standards").  *See* Exhibit B.

3        6.      Pursuant to the Minimum Standards, an employee who brings an arbitration case

4  to JAMS must pay an initial relatively nominal filing fee (similar to the fee that would be

5  required for a court). However, all other arbitration fees, including fees to pay the arbitrator,

6  must be borne by the employer.  *See* Exhibit B, at 4 (Standard No. 6).

7        7.      Following Twitter's moving to compel arbitration in several class action lawsuits

8  brought against it in court, Petitioner and approximately two thousand other former employees,

9  in accordance with their arbitration agreements, filed arbitration demands against Twitter with

10  JAMS.  In each of these cases, JAMS has notified the parties that it has determined the Minimum

11  Standards for employment disputes apply.  Twitter agreed to their application by including

12  JAMS in its arbitration agreements, not objecting timely to the designation (*see infra* at 6 n.2),

13  and (as explained in JAMS Minimum Standards letter) by proceeding in the arbitration process.

14        8.      Pursuant to JAMS procedures, a number of these arbitrations began

15  administration, a number of arbitrators were appointed, and hearing dates and other dates began

16  to be scheduled.

17        9.      Petitioner Fabien Ho Ching Ma filed his arbitration demand on January 11, 2023.

18  *See* Exhibit C.  An arbitrator was appointed to his case, and a final hearing was scheduled for

19  December 2023.

20        10.     However, on June 2, 2023, after approximately 2,000 individual arbitrations had

21  been filed against it, Twitter reversed course.  Despite knowing that JAMS rules require

22  employers to pay the full arbitrator fees in employment cases under the Minimum Standards,

23  Twitter submitted a letter to JAMS' General Counsel, Sheri Eisner, requesting that all arbitration

24  fees be split equally among the parties (in all states other than California and a few other states,

25  including Nevada and Oregon).  Counsel for claimants quickly objected.

26

27

28

11.     On June 21, 2023, JAMS replied to Twitter's letter, reaffirming that the Minimum Standards were applicable and stating that JAMS would decline to administer arbitrations in which the employer did not agree to abide by the Minimum Standards. *See* Exhibit D.

12.     On June 28, 2023, Twitter sent another letter to JAMS informing it that Twitter would refuse to proceed with arbitrations in most states outside California.  It attached a list of 891 arbitrations in which it was refusing to proceed, including Petitioner's.  *See* Exhibit E.

13.     On June 30, 2023, JAMS informed the parties that it would decline to arbitrate any disputes in which Twitter refused to pay its required fees and claimants did not waive application of the Minimum Standards.  Shortly thereafter, JAMS notified the parties that scheduled conferences and hearings in these matters would be cancelled.

14.     Petitioner has filed this Petition on behalf of himself and the other similarly situated employees who have brought arbitration claims against Twitter seeking to compel Twitter to arbitrate their cases, pursuant to the terms of the arbitration agreement that Twitter drafted and signed, which included JAMS Rules and thereby incorporated the Minimum Standards for employment cases, requiring the employer to bear the full arbitrator fees.

## **PARTIES**

15.     Petitioner Fabien Ho Ching Ma is an adult resident of Brooklyn, New York, who has filed a demand for arbitration with JAMS against Twitter challenging its unlawful actions following Elon Musk's acquisition of the company.

16.     Petitioner Ma brings this Petition to Compel Arbitration as a Rule 23 class action on behalf of all former Twitter employees throughout the United States who have filed demands for arbitration against Twitter with JAMS, and whose arbitrations JAMS has determined are subject to the Minimum Standards, but for whom Twitter has refused to abide by the Minimum Standards and pay the arbitration fees in full.

17.     Respondent Twitter, Inc. is a Delaware corporation headquartered in San Francisco, California.

3

PETITION TO COMPEL ARBITRATION

18.     Respondent X Corp. is a Nevada corporation headquartered in San Francisco, California.

19.     In or about March 2023, Twitter, Inc. merged with X Corp., and as a result Twitter, Inc. and X Corp. are a single entity. X Corp. has successor liability for the unlawful acts of Twitter, Inc. Twitter, Inc. and X Corp. are referred to herein as "Twitter".

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 9 U.S.C. § 4 and 28 U.S.C. § 1332 because the underlying matters in controversy collectively exceed the sum or value of $5,000,000, exclusive of interest and costs, and the vast majority of, if not all, members of the Petitioner class reside in a different state from Respondents.

21.     This Court has personal jurisdiction over Twitter, Inc. and X Corp. because both entities have their headquarters and principal places of business in California.

22.     Venue is proper in this district (San Francisco Division) pursuant to 9 U.S.C. § 4 and 28 U.S.C. § 1391(b) because both Twitter, Inc. and X Corp. are headquartered and conduct business in San Francisco County, and many of the acts and omissions complained of occurred in San Francisco County.

## BACKGROUND

23.     Twitter is a social media company that used to employ thousands of people across the United States.

24.      In April 2022, it was announced that multi-billionaire Elon Musk would be purchasing the company. Since his purchase, the company has laid off, terminated, or constructively discharged a very substantial portion (75% or more) of its employees.

25.     These employees have made various claims against the company concerning their separations from Twitter, including claims related to unpaid severance payments, discrimination, and other legal obligations that Twitter has refused to comply with.

1    26.    Petitioner and the majority of those similarly situated signed substantially

2  identical arbitration agreements with Twitter that require their claims to be pursued in arbitration

3  proceedings conducted by JAMS.  *See* Exhibit A.

4    27.    When class action lawsuits were filed against Twitter in court, Twitter regularly

5  moved to compel arbitration, and it succeeded (with respect to employees who were bound by an

6  arbitration clause).  *See Borodaenko v. Twitter, Inc.*, 2023 WL 3294581 (N.D. Cal. May 5,

7  2023); *Rodriguez v. Twitter, Inc.*, 2023 WL 3168321 (N.D. Cal. May 1, 2023); *Cornet v. Twitter,*

8  *Inc.*, 2023 WL 187498 (N.D. Cal. Jan. 13, 2023); *see also Gadala v. Twitter, Inc.*, No. 3:23-cv-

9  01595-JSC (N.D. Cal. May 15, 2023)[1]; *Adler v. Twitter, Inc.*, No. 3:23-CV-01788 (N.D. Cal.

10  May 12, 2023) (Dkt. 14) (Twitter's motion to compel arbitration, which was withdrawn because

11  plaintiff opted out of arbitration).

12    28.    These arbitration agreements provide: "Employee and the Company agree to

13  bring any claim in arbitration before Judicial Arbitration and Mediation Services ('JAMS'),

14  pursuant to the then-current JAMS Rules…." Exhibit A at 2, § 5.

15    29.    JAMS Rules provide: "(a) The JAMS Employment Arbitration Rules and

16  Procedures ('Rules') govern binding Arbitrations of disputes or claims that are administered by

17  JAMS and in which the Parties agree to use these Rules or, in the absence of such agreement, the

18  disputes or claims are employment-related, unless other Rules are prescribed. (b) The Parties

19  shall be deemed to have made these Rules a part of their Arbitration Agreement ('Agreement')

20  whenever they have provided for Arbitration by JAMS under its Employment Rules or for

21  Arbitration by JAMS without specifying any particular JAMS Rules and the disputes or claims

22  meet the criteria of the first paragraph of this Rule."

---

[1]    In its Order regarding arbitration, the court in *Gadala* stated: "Plaintiff [a Florida
resident] shall only be required to pay the JAMS arbitration filing fee up to the amount she
would pay to initiate an action in this Court; Defendants shall be required to pay all other costs of
arbitration." No. 3:23-cv-01595-JSC (Dkt. 18).

1    30.    JAMS Rules further provide: "The Parties may agree on any procedures not

2 specified herein or in lieu of these Rules that are consistent with the applicable law and JAMS

3 policies (including, without limitation, the JAMS Policy on Employment Arbitration Minimum

4 Standards of Procedural Fairness and Rules 15(i), 30 and 31)."

5    31.    The JAMS Policy on Employment Arbitration Minimum Standards of Procedural

6 Fairness provides: "The only fee that an employee may be required to pay is JAMS' initial Case

7 Management Fee. All other costs must be borne by the company, including any additional JAMS

8 Case Management Fee and all professional fees for the arbitrator's services." Exhibit B, at 4

9 (Standard No. 6).

10    32.    Petitioner and those similarly situated have filed with JAMS demands for

11 arbitration against Twitter. *See, e.g.,* Exhibit C.

12    33.    Since late in 2022, when arbitration demands began being filed, arbitrations have

13 proceeded, arbitrators have been appointed, and arbitration conferences and hearings have been

14 scheduled.

15    34.    As described above, Twitter has recently informed JAMS, Petitioner, and others

16 similarly situated, through counsel, that it will not proceed in JAMS with arbitration under the

17 Minimum Standards for arbitrations outside California and several other states because Twitter

18 refuses to pay the full arbitration fees for these cases.[2] *See* Exhibit E.

19    35.    On June 30, 2023, following Twitter's notice of its refusal to pay these fees,

20 JAMS notified the parties that: "JAMS will close its file as JAMS will not proceed with cases

21 that we have determined fall under our Employment Minimum Standards if Respondent will not

22 abide by those standards."

23

24

25    _____

26 [2]    In addition to being incorrect in its objection to these Minimum Standards, Twitter's objection was too late.  JAMS' rules provide that "If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION [which includes employment disputes], Respondent should communicate this objection in writing to the JAMS case manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration".  Exhibit C, at 5.

27

28

6

PETITION TO COMPEL ARBITRATION

36.     Under the arbitration agreement that Twitter drafted and the parties signed, the parties are required to abide by JAMS Rules, which in turn require application of the Minimum Standards.  Moreover, while JAMS Rules permit the parties to agree to other rules, JAMS policy requires application of the Minimum Standards.  JAMS has stated that it will refuse to proceed with administering arbitrations for which Twitter does not agree to comply with the Minimum Standards (unless Claimants agree to waive those standards, which Petitioner and others similarly situated have not agreed to waive).

37.     By refusing to abide by the JAMS Minimum Standards and pay the full arbitrator fees as required by those standards (which Twitter was or should have been aware of when entering into these arbitration agreements and moving to compel employees' claims to arbitration), Twitter has interfered with Petitioner and other employees' right to arbitrate their claims at JAMS, as required by their agreements.

38.     As a result, Petitioner and those similarly situated are aggrieved by Twitter's failure, neglect, and refusal to arbitrate under its own written agreement, which requires Twitter's compliance with the JAMS Minimum Standards.

39.     Accordingly, this Court should compel Twitter to arbitrate under 9 U.S.C. § 4.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner, on his own behalf and on behalf of those similarly situated, respectfully requests that this Court:

1.     Enter an Order requiring that Twitter arbitrate the claims of Petitioner and those similarly situated pursuant to the terms of their arbitration agreements, including by complying with JAMS Minimum Standards and paying the arbitration fees and costs JAMS determines are necessary to empanel arbitrators and proceed with arbitrations.

2.     Award any additional relief to which Petitioner and those similarly situated are entitled.

7
PETITION TO COMPEL ARBITRATION



1

2                                          Respectfully submitted,

3                                          FABIEN HO CHING MA, on behalf of himself and
                                           all others similarly situated,

4                                          By his attorneys,

5

6                                          /s/ Shannon Liss-Riordan
                                           Shannon Liss-Riordan, SBN 310719
7                                          Thomas Fowler (*pro hac vice* forthcoming)
                                           Bradley Manewith (*pro hac vice* forthcoming)
8                                          LICHTEN & LISS-RIORDAN, P.C.
                                           729 Boylston Street, Suite 2000
9                                          Boston, MA 02116
                                           (617) 994-5800
10                                         Email:  sliss@llrlaw.com; tfowler@llrlaw.com;
                                           bmanewith@llrlaw.com
11
     Dated:        July 3, 2023
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         8
                          PETITION TO COMPEL ARBITRATION

# EXHIBIT 8

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 23, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ARNAUD WEBER,<br><br>               Plaintiff,<br><br>   v.<br><br>X CORP., ELON MUSK, LINDA YACCARINO, and JOHN/JANE DOES III-V,<br><br>            Defendants. | NO: 2:23-CV-0233-TOR<br><br>ORDER OF DISMISSAL WITH PREJUDICE |

BEFORE THE COURT is the parties' Stipulated Motion to Dismiss. ECF No. 24. The parties agree that the above-captioned action should be dismissed in its entirety, with prejudice, and with each party bearing its own fees and costs. The Court has reviewed the record and files herein and is fully informed.

According to Rule 41(a)(1)(A)(ii), a plaintiff may dismiss an action by filing a stipulation signed by all parties who have appeared.

ORDER OF DISMISSAL WITH PREJUDICE ~ 1

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Pursuant to Rule 41(a)(1)(A)(ii) and the parties' stipulation, this action is

   **DISMISSED** with prejudice and with each party bearing its own fees and

   costs.

2. The STAY is lifted for purposes of entering this Order.

   The District Court Executive is directed to enter this Order and Judgment of

Dismissal, furnish copies to counsel, and **CLOSE** the file.

   DATED January 23, 2024.



                                 THOMAS O. RICE
                              United States District Judge

ORDER OF DISMISSAL WITH PREJUDICE ~ 2