1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    FABIEN HO CHING MA, et al.,            Case No. 23-cv-03301-JST

                    Petitioners,
8
                                            **ORDER DENYING MOTION TO**
9         v.                                **COMPEL ARBITRATION; ORDER**
                                            **PARTIALLY STAYING CASE**
10   TWITTER, INC., et al.,
                                            Re: ECF No. 26
11                  Respondents.

12

13         Before the Court is Petitioners' motion to compel arbitration.  ECF No. 26.  The Court

14   previously denied the motion without prejudice to allow consideration of Petitioners' motion for

15   class certification.  ECF No. 46.  The Court has denied class certification and will now deny the

16   individual Petitioners' motion to compel arbitration.  However, the Court will stay the case as to

17   three Petitioners so that they can pursue an order compelling arbitration from an appropriate

18   district court and order the parties to meet and confer as to further proceedings regarding the

19   remaining three Petitioners.

20   **I.    BACKGROUND**

21         Petitioners Fabien Ho Ching Ma, Laila Amlani, Jonathan Willis, Melissa Olson, Sasha

22   Solomon, Ryan Crowley, Grae Kindel, Sarah Rosen, and Adam Treitler filed a petition to compel

23   arbitration against Respondents Twitter, Inc. and X Corp. "on behalf of all former Twitter

24   employees throughout the United States who have filed demands for arbitration against Twitter,

25   but for whom Twitter has refused to proceed with arbitrating their claims."  ECF No. 6 ¶¶ 1, 17.

26   The Court denied class certification, ECF No. 58, and X Corp.[1] has "allowed the claims of Lenna

27   _____

28   [1] Although Respondents initially "refer[red] to both entities as 'Twitter,'" *e.g.*, ECF No. 35 at 8
     n.2, they now refer to themselves collectively as "X Corp," *e.g.*, ECF No. 63 at 5.

United States District Court
Northern District of California

(Grae) Kindel, Sarah Rosen, and Sasha Solomon to move forward."  ECF No. 50 at 15 n.7.  This leaves the individual claims of Ma, Amlani, Willis, Olson, Crowley, and Treitler remaining for resolution.

All of these Petitioners except for Crowley have presented signed dispute resolution agreements ("DRAs") selecting Judicial Arbitration and Mediation Services ("JAMS") as the arbitration provider, and stating that the parties "agree to bring any claim in arbitration . . . pursuant to the then-current JAMS Rules."  ECF No. 6-1 at 3–5 (Ma); *id.* at 7–9 (Amlani); *id.* at 11–13 (Willis); *id.* at 15–17 (Olson); *id.* at 29–31 (Treitler).  X Corp. asserts that Crowley signed the same agreement, ECF No. 35 at 10, but Crowley has filed a declaration stating that he does not have a signed copy of the agreement, and that his arbitration has not moved forward "[b]ecause JAMS has required a signed copy of my arbitration agreement in order to administer my arbitration, and Twitter has not provided the signed copy," ECF No. 26-4 ¶¶ 2, 4.

Each Petitioner demanded arbitration with JAMS and requested hearing locations outside of this district: Ma and Treitler in New York, NY, ECF No. 6-5 at 6, 36; Amlani in San Diego, CA, *id.* at 12; Willis in Sacramento, CA, *id.* at 18; Olson in Chicago, IL, *id.* at 24; and Crowley in Riverside, CA, *id.* at 30.  Amlani, Willis, and Olson "worked for Twitter in Arizona, Idaho, [and] Wisconsin, . . . respectively.  JAMS does not have offices in these states.  In their arbitration demands, they therefore listed the nearest JAMS office, and they agreed to use arbitrators from nearby states to hear their cases."  ECF No. 6 ¶ 60.  As to these three Petitioners, X Corp. "do[es] not agree to use, or have JAMS appoint, an arbitrator who is not licensed in the state of the claimant."  ECF No. 26-8 at 2.

The parties do not dispute that Petitioners signed the DRA and did not opt out, nor do they dispute that Petitioners' claims fall within the scope of the agreement.  However, they disagree on three issues: (1) who must pay the arbitration fees; (2) what should happen with the arbitrations initiated by Amlani, Willis, and Olson, who worked for X Corp. in states where JAMS has no arbitrators; and (3) whether X Corp. is required to produce a signed copy of the arbitration agreement to Crowley.

Section 3 of the DRA, "Selecting The Arbitrator," states:

> The Arbitrator shall be selected by mutual agreement of the Company and the Employee.  Unless the Employee and Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted.  If, however, the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, or at the request of either party, the dispute shall be heard by a neutral arbitrator chosen according to the procedures found in the then-current JAMS Employment Arbitration Rules and Procedures ("JAMS Rules").  The JAMS Rules may be accessed at: https://www.jamsadr.com/rules-employment-arbitration/.  Alternatively, an Employee may obtain a copy of the JAMS Rules from Human Resources.  The location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise.

*E.g.*, ECF No. 6-1 at 4.  Section 6, "Paying For The Arbitration," includes the following:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees.  If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

*Id.*

Relying on Section 6, X Corp. requested that arbitration costs be shared equally by the parties.  ECF No. 36 at 5–7.  JAMS denied that request, with its general counsel explaining in a June 21, 2023 letter that:

> JAMS notified the parties at the outset of these matters that the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards" or "Standards") applies.  The Minimum Standards reflect JAMS administrative policy to administer employment arbitrations under the protections provided in the Minimum Standards.  Application of the Standards is separate and apart from the protections that may apply in any given jurisdiction, and JAMS applies the Standards nationwide.  While the Minimum Standards might go further than the law requires in a particular jurisdiction, JAMS has chosen to conduct its business in a manner which provides these protections for employees where the arbitration agreement is not negotiated and is required as a condition of employment.  As our notice at the outset of each case advised, JAMS applies the Minimum Standards notwithstanding any contrary provision in the parties' arbitration agreement (unlike the JAMS Rules, which are subject to party-agreed procedures consistent with JAMS Rule 2).

3

> The Minimum Standards do not prevent an employee from contributing to JAMS fees (see the Comment under Standard No. 6). However, absent employee agreement JAMS will continue to issue invoices in these matters consistent with Standard No. 6.
>
> Where JAMS has determined the Minimum Standards apply and an employer declines to proceed under the Minimum Standards, JAMS will decline to administer the arbitration.
>
> As our notice in each case advised, any further issue about whether the Minimum Standards apply in a given case should be directed to the arbitrator in the case. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination.

ECF No. 6-3 at 2. Standard No. 6 of the Minimum Standards states:

> An employee's access to arbitration must not be precluded by the employee's inability to pay any costs or by the location of the arbitration. The only fee that an employee may be required to pay is the initial JAMS Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fees and all professional fees for the arbitrator's services. In California, the arbitration provision may not require an employee who does not prevail to pay the fees and costs incurred by the opposing party.

ECF No. 6-2 at 5.

On June 28, 2023, X Corp. responded to JAMS's letter. It "decline[d] to proceed under the Minimum Standards for all demands in jurisdictions where fee-sharing is lawful," including the arbitrations initiated by Ma, Olson, and Treitler, and noted its understanding "that, in accordance with your June 21 letter, JAMS will no longer administer these arbitrations." ECF No. 6-4 at 2, 11, 12, 16. Two days later, a JAMS practice manager stated in an email to the parties that, "[i]f Claimants [do] not waive Standard 6, JAMS will close its file as JAMS will not proceed with cases that we have determined fall under our Employment Minimum Standards if Respondent will not abide by those standards." ECF No. 6-6 at 3. Petitioners did not agree to waive Standard No. 6 or to contribute to JAMS fees voluntarily. Nonetheless, the parties agree that, although none of the arbitrations is currently moving forward, JAMS has not terminated any of Petitioners' arbitration proceedings. ECF No. 62 at 2; ECF No. 63 at 13.

## II.      DISCUSSION

### A.      Venue

The Court first addresses X Corp.'s arguments that Petitioners filed their petition in the wrong venue.  Petitioners seek to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4.  That statute provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition *any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties*, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4 (emphasis added).  X Corp. does not dispute that this Court is a proper venue under that provision, but Section 4 goes on to say that:

> upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court *shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.  The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.*

*Id.* (emphasis added).  X Corp. argues that the Court therefore cannot grant relief under Section 4 because it can only order arbitration to occur in this district, but such an order would not be in accordance with the terms of the DRA, which provides that "[t]he location of the arbitration proceeding shall be no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees in writing otherwise."  ECF No. 6-1 at 4.  Petitioners did not work for Twitter in this district, and X Corp. has not consented to have the arbitration proceedings here.

In some circuits, X Corp.'s argument would prevail.  For example, in the Seventh Circuit, "where the arbitration agreement contains a forum selection clause, only the district court in *that forum* can issue a § 4 order compelling arbitration."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327 (7th Cir. 1995) (emphasis in original).  The rule is the same in the Sixth and Tenth Circuits.  *Mgmt. Recruiters Int'l, Inc. v. Bloor*, 129 F.3d 851, 854 (6th Cir. 1997); *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005).  One rationale for

United States District Court
Northern District of California

United States District Court
Northern District of California

such a rule is that, otherwise, "any party to an arbitration agreement could avoid the effect of the agreed-to forum merely by filing suit in a different district," which "in turn could lead to the parties racing to different courthouses to obtain what each thinks is the most convenient forum for it, in disregard of its contractual obligations." *Snyder v. Smith*, 736 F.2d 409, 419–20 (7th Cir. 1984), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

The Ninth Circuit, however, has not adopted this rule. To the contrary, the court has affirmed an order compelling arbitration in the District of Oregon, where the petition to compel arbitration had been brought, even though "such an order [did] not conform to the agreement of the parties for an arbitration in New York." *Continental Grain Co. v. Dant & Russell*, 118 F.2d 967, 969 (9th Cir. 1941). In that case, it was the petitioner that sought to have arbitration compelled in New York after filing its petition in Oregon, and the Ninth Circuit noted that the petitioner "invoked the jurisdiction of the United States District Court for Oregon" and was "hardly in a position to complain that it has exercised that jurisdiction in accordance with the statute giving it jurisdiction." *Id.* Although X Corp. did not invoke the jurisdiction of this Court, *Continental Grain* nonetheless stands for the proposition that venue for a petition to compel arbitration is proper in districts outside of those that would include the contracted-for arbitral forum. More recently, citing *Continental Grain*, the Ninth Circuit explicitly stated that, "§ 4 only confines the *arbitration* to the district in which the petition to compel is filed. It does not require that the petition be filed where the contract specified that arbitration should occur." *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 785 (9th Cir. 2001) (emphasis in original). Under these binding authorities, this Court is a proper venue for the petition even though it may not, if it determines that arbitration should be compelled, order arbitration to occur outside this district.

### B.    Petitioners Ma and Treitler

The Court next addresses the arbitration demands of Ma and Treitler, who initiated arbitration with JAMS, but whose arbitrations have not moved forward because X Corp. has not paid the initial arbitration fees as required by JAMS.

#### 1.    X Post by Elon Musk

Petitioners argue that X Corp. should be compelled to pay Treitler's arbitration fees

because "Twitter informed [Treitler] that [he] was laid off from [his] job because of a tweet [he] posted about Elon Musk," ECF No. 26-6 ¶ 3, and, seven months later, Musk posted on X: "If you were unfairly treated by your employer due to posting or liking something on this platform, we will fund your legal bill.  No limit.  Please let us know."  ECF No. 6-13 at 2.  As X Corp. correctly observes, Petitioners cite no legal authority for the proposition that Musk's post created a contract to pay legal fees.  Petitioners' reply does not address this argument, and the Court finds no basis for requiring X Corp. to pay Treitler's arbitration fees based on Musk's post on X.

### 2.    Initial Allocation of Arbitration Fees by JAMS

Petitioners also argue that X Corp. should have to abide by the JAMS general counsel's decision that X Corp. must pay all of the initial arbitration fees.  Two district courts have addressed the same DRA at issue in this case and have reached different conclusions.

In *Frazier v. X Corp.*, the court "grant[ed] the motion to compel arbitration and order[ed] Twitter to pay all ongoing arbitration fees for petitioners' claims unless and until the individual arbitrator in each of petitioners' respective arbitrations rules to the contrary."  739 F. Supp. 3d 219, 231 (S.D.N.Y. 2024).  The parties agreed that "the ultimate decision of who is required to pay ongoing arbitration fees must be resolved by an individual arbitrator," *id.* at 224, and the court concluded that "interim fee determinations—or at least those relating to the Minimum Standards—will be made by JAMS in the first instance, then later reviewed by an individual arbitrator or court," *id.* at 226.  The court explained that "[w]hether the Minimum Standards apply is . . . a procedural issue generally reserved for the arbitrator," and that "[t]he JAMS General Counsel is, in effect, standing in the shoes of the individual arbitrator until one has ruled to the contrary."  *Id.* at 227–28.  However, the court went on to explain that if it were to review the decision to apply the Minimum Standards de novo, it would reach the same result as JAMS and conclude that they apply to the agreement at issue because, even though employees could opt out of arbitration after signing the DRA, they were nonetheless required to sign the DRA as a condition of employment.  *Id.* at 228–30.  Finally, the court concluded that requiring X Corp. to pay initial arbitration fees did not conflict with the DRA's provision that fees would be "apportioned" because requiring "that fees must be 'apportioned' does not dictate *how* the fees


should be apportioned." *Id.* at 230 (emphasis in original).

Several months later, the court in *Rosa v. X Corp.* reached a contrary result, concluding that the Minimum Standards did not apply to the agreement because employees had the ability to opt out. *Rosa v. X Corp.*, No. 2:23-cv-22908 (BRM) (AME), 2024 WL 4903619, at *10–11 (D.N.J. Nov. 27, 2024) (designated as "not for publication"). The court concluded that Section 6 of the agreement should be "given the meaning asserted by Twitter" so as not to render the apportionment language superfluous. *Id.* at *11. It then concluded that X Corp. did not waive its right to compel arbitration by refusing to pay the initial JAMS fees, and it ordered the parties "to arbitrate pursuant to the terms of the DRA. Rosa and Twitter shall each pay half of the requisite JAMS fee in order to properly initiate arbitration proceedings as Section 6 of the DRA is given effect regarding apportionment of the initial fee-sharing since JAMS Minimum Standards [are] inapplicable." *Id.* at *12–13. *Rosa* did not cite *Frazier*, nor did it address questions regarding delegation or the meaning of "apportion."

Having reviewed both *Frazier* and *Rosa* and considered all of the parties' arguments, this Court concludes, for the reasons discussed below, that JAMS was authorized to make the initial determination regarding allocation of fees, and that its determination did not conflict with terms of the DRA. In states where applicable law does not require the employer to pay all arbitration fees, the DRA delegates apportionment of fees to the arbitrator. ECF No. 6-1 at 4 (Section 6). The arbitrator has not been able to make that determination in Petitioners' cases because X Corp.'s failure to pay fees as required by JAMS has prevented any of the arbitration proceedings from moving forward. This raises two issues: first, whether the agreement requires any specific apportionment and, second, if not, who decides the initial apportionment of fees before an arbitrator has started proceedings.

On the first question, X Corp. argues that Section 6 of the DRA requires fees to be split equally between the parties unless and until an individual arbitrator rules otherwise, and that anything other than a 50/50 initial allocation violates the agreement. However, Section 6 does not—in contrast to provisions at issue in cases on which X Corp. relies—provide that "[t]he parties shall share the costs of . . . arbitration *equally*." *Goobich v. Excelligence Learning Corp.*,

No. 5:19-cv-06771-EJD, 2020 WL 5593011, at *2 (N.D. Cal. Sept. 18, 2020) (emphasis added); *see also Brown v. Peregrine Enterprises, Inc.*, No. 22-2959, 2023 WL 8800728, at *2 (2d Cir. Dec. 20, 2023) (summary order) (agreement provided that "the parties to arbitration shall *equally* share the costs and expenses charged by the AAA or the arbitrator during the pendency of the arbitration prior to a determination of which is the prevailing party" (emphasis added)); *Bahoor v. Varonis Sys., Inc.*, 152 F. Supp. 3d 1091, 1100 (N.D. Ill. 2015) (agreement provided that "the parties to the arbitration shall each pay an *equal share* of the costs and expenses of such arbitration, except as prohibited by law" (emphasis added)).  Instead, Section 6 provides that "fees will be apportioned between the parties in accordance with said applicable law" where the law does not require the company to pay all fees.  ECF No. 6-1 at 4.  As X Corp. concedes, "applicable law in the relevant states does not create a freestanding obligation that parties split arbitration fees irrespective of the actual terms of their agreement."  ECF No. 42 at 17.  In other words, "said applicable law" does not require an equal apportionment of fees, and an unequal apportionment therefore does not conflict with such law.

Nor, contrary to X Corp.'s assertions, does Section 6 "explicitly require[] the parties to share fees between them (where applicable law permits it)" or specify a "default apportionment of fees."  ECF No. 63 at 9, 10.  As the *Frazier* court persuasively explained:

> Twitter argues that the word "apportioned" in this provision means that the fees must be split 50/50 between the parties.  In support of [this] argument, Twitter cites several dictionary definitions of "apportion."  *See Oxford English Dictionary* 579 (2d ed. 1989) ("To assign in proper portions or shares; to divide and assign proportionally; to portion out, to share."); *Webster's New International Dictionary* 132 (2d ed. 1955) ("To divide and assign in just proportion; to divide and distribute proportionally; to make an apportionment of; portion out; to allot.").
>
> But even these definitions do not require a 50/50 split.  Thus, even using these definitions, the fact [that arbitration] fees must be "apportioned" does not dictate *how* the fees should be apportioned. *Cf. Freeman v. SmartPay Leasing, LLC*, 771 F. App'x 926, 934 (11th Cir. 2019) (concluding contract provision requiring each party pay "its own attorneys' fees and other costs of the arbitration" did not conflict with JAMS's Minimum Standards for consumer contracts, requiring the employer pay all ongoing costs, because the provision simply "suggests that the parties must pay their own costs as determined by that organization"); *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004)

United States District Court
Northern District of California

9

(suggesting arbitrator "apportion[ed]" ongoing arbitration fees by exercising its discretion to require one party to pay 100% of those fees). The dictionary definitions Twitter cites make reference to "divid[ing] and assign[ing] proportionally, or "distribut[ing] proportionally," but this says nothing about how large the respective portions should be. And other definitions of the word in the very same dictionaries refer to allocating the "proper portions" or "just proportion," which of course begs the question of what is "proper" or "just." Here, invoking the Minimum Standards, JAMS apportioned the case initiation fee to petitioners and all other ongoing fees to Twitter. This allocation is entirely consistent with . . . the DRA.

739 F. Supp. 3d at 230–31 (emphasis in original) (citations to briefs omitted).

X Corp. argues that reading Section 6 to require anything other than a 50/50 split between the parties is improper because it would render the apportionment provision superfluous. The Court disagrees. If the law of a particular state requires it, X Corp. must pay all arbitration fees. If it does not, X Corp. must pay whatever fees the arbitrator decides it must. These are two distinct procedures. Even if an arbitrator might choose to apportion all fees to the company in states where that result is not required by law, this potential does not render superfluous any provision of Section 6 because allowing an arbitrator to apportion fees does not guarantee that the company will have to pay all fees where the law does not require it.

For the above reasons, the Court concludes that the DRA does not require any specific apportionment of fees if applicable law does not require the company to bear all costs. The Court must therefore reach the second question of who should determine the initial apportionment of fees before an arbitrator has the opportunity to decide the final apportionment. X Corp.'s briefing is silent on this topic, perhaps because it focuses on urging the Court to interpret the DRA as requiring an equal apportionment of fees. But in the absence of any default apportionment, someone must have the authority to determine the initial apportionment before a case proceeds to an arbitrator.

The Court concludes that the DRA delegated this question to JAMS, on whose behalf its general counsel was authorized to act. Section 5 of the DRA specifies that arbitrations must be conducted under JAMS Rules. ECF No. 6-1 at 4. Those rules authorize JAMS to act before an arbitrator has been appointed, including to "issue[] a Commencement Letter" that confirms, among other things, "that JAMS has received all payments required under the applicable fee

schedule," Rules 5(a), (b); to "convene . . . administrative conferences to discuss any procedural matter relating to the administration of the Arbitration," Rule 6(a); to "determine the location of the Hearing," Rule 6(b); to "grant reasonable extensions of time to file a response or counterclaim," Rule 9(c); and to resolve "[d]isputes concerning the appointment of the Arbitrator," Rule 11(c).  Rule 1(c) provides that "the office of JAMS General Counsel" may carry out "[t]he authority and duties of JAMS as prescribed in the Agreement of the Parties and in these Rules." Indeed, X Corp. does not object to—and, in fact, relies on—JAMS's general counsel's determination that a signed arbitration agreement is required to initiate an arbitration and that JAMS would therefore withdraw its invoices for filing fees in cases where there was neither proof of a signed agreement or court order naming JAMS as the arbitration provider.  ECF No. 6-12 at 2. X Corp. thus concedes that JAMS's general counsel has at least some authority over initial fees.

Additionally, under JAMS Rule 2(a), parties may "agree on any procedures not specified herein or in lieu of these Rules that are consistent with . . . JAMS policies (including, without limitation, the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness . . .)."  *JAMS Employment Arbitration Rules & Procedures (English)*, effective June 1, 2021, https://www.jamsadr.com/rules-employment-arbitration/english [https://perma.cc/WF38-SE9M].  That is, parties may not agree to procedures that are inconsistent with JAMS policies, including the Minimum Standards, which provide: "If JAMS becomes aware that an arbitration clause or procedure does not comply with the Minimum Standards, it will notify the employer of the Minimum Standards and inform the employer that the arbitration demand will not be accepted unless there is full compliance with those standards."  ECF No. 6-2 at 5.  As the *Frazier* court concluded, this provision "delegate[s] to JAMS the authority to make an initial assessment of whether the Minimum Standards are being complied with" and "grants JAMS the authority to do precisely what happened here: make an initial determination about whether the Minimum Standards apply."  739 F. Supp. 3d at 226.

The *Frazier* court also explained that the JAMS general counsel is authorized to apportion initial fees, and that courts should defer to that authority:

> [T]he Minimum Standards vest JAMS with discretion to make the

United States District Court
Northern District of California

initial determination about whether the Minimum Standards apply, and hence whether Twitter is obligated to pay all ongoing fees. Pursuant to this authority, JAMS, at the commencement of the arbitrations here, informed Twitter that the Minimum Standards would apply and, after Twitter objected to this, JAMS's General Counsel sent Twitter a formal letter overruling its objection. In making this determination, JAMS' General Counsel was authorized to act on behalf of JAMS as an organization and carry out its duty under the JAMS Rules. *See* JAMS Rule 1(c) ("[T]he authority and duties of JAMS as prescribed in the Agreement of the Parties and in these Rules shall be carried out by . . . the office of JAMS General Counsel or their designees."). . . .

Insofar as the parties agreed to have JAMS resolve interim fee disputes, that delegation should be enforced in a similar manner as any other agreement to arbitrate. *Cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68, 139 S. Ct. 524, 202 L. Ed. 2d 480 (2019) ("[A]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." (internal quotation marks omitted)).

Procedural questions relating to the rules of arbitration are generally matters for the arbitrator, and not for the court, to resolve. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002) ("[P]rocedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." (internal quotation marks omitted)); *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, 2021 WL 2350094, at *14 (S.D.N.Y. June 8, 2021) ("As a general matter, in all areas of arbitration law, the court gives deference to an arbitrator's application of the procedural rules of the arbitral tribunal."). Whether the Minimum Standards apply is just such a procedural issue generally reserved for the arbitrator. *See Giordano v. Sparrow Healthcare, LLC*, 2022 WL 3597084, at *2 (M.D. Fla. May 13, 2022) (holding that dispute over which set of AAA rules applied was "a procedural dispute" which "the arbitrator is in the best position to" resolve). The same is generally true as to disputes over which party is obligated to pay arbitration fees. *See Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884, 887 (5th Cir. 2009) (holding that "[p]ayment of fees is a procedural condition precedent" to be resolved by arbitrator); *see also Suqin Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 389 (S.D.N.Y. 2017) ("Generally, the interpretation of specific provisions of the arbitration agreement are not questions of arbitrability and are reserved for the arbitrator.")[.]

While the Court is unaware of any case expressly extending such deference to determinations by the arbitration association itself, the Court sees no reason why such deference should not apply with equal force here. The JAMS General Counsel is, in effect, standing in the shoes of the individual arbitrator until one has ruled to the contrary, and so in that sense her decision is no different than that of an individual arbitrator. Further, the rationale behind this rule is that

arbitrators are "comparatively more expert about the meaning of their own rule[s]," and this logic applies with equal (if not greater) force to decisions by the JAMS General Counsel. *Howsam*, 537 U.S. at 85, 123 S. Ct. 588.

*Id.* at 227–28; *see also Nguyen v. Impac Mortg.*, No. SA CV 17-0723-DOC (KESx), 2018 WL 5880825, at *11 (C.D. Cal. Aug. 23, 2018) (declining to "order Defendants to pay arbitration costs as they are incurred," where agreement stated, "The Company will pay for all of the costs and expenses of such arbitration," because Plaintiffs did "not demonstrate that the Court—as opposed to the arbitrator—should resolve the allocation of costs, and because any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

Accordingly, the Court defers to JAMS's determination, made by its general counsel, regarding the apportionment of the initial arbitration fees and finds no basis to evaluate JAMS's interpretation of its own rules. JAMS has determined that the Minimum Standards apply, and that determination complies with the DRA. Under Section 6 of the DRA, an individual arbitrator, once a case proceeds that far, may re-evaluate apportionment of fees—which JAMS itself acknowledges. ECF No. 6-3 at 2 ("As our notice in each case advised, any further issue about whether the Minimum Standards apply in a given case should be directed to the arbitrator in the case. After hearing from the parties, if the arbitrator believes JAMS should revisit the issue, the arbitrator may advise JAMS accordingly. JAMS will then review the issue, taking the arbitrator's position into consideration, and will make a final determination.").[2]

X Corp. is therefore obligated to pay the initial arbitration fees, as ordered by JAMS, so that the arbitrations as to Ma and Treitler can move forward. However, as noted above, under 9 U.S.C. § 4, the Court may only compel arbitration within this district. Such a result would contravene the parties' agreement that the arbitration occur "no more than 45 miles from the place where the Employee reported to work for the Company, unless each party to the arbitration agrees

---

[2] X Corp. is correct that this letter from JAMS's general counsel "did not expressly concede that JAMS would defer" to the decision made by an individual arbitrator, but "[t]he speculative possibility that JAMS might refuse to comply with an individual arbitrator's ruling in [X Corp.'s] favor does not provide a basis for denying petitioners' request for relief here." *Frazier*, 739 F. Supp. 3d at 227 n.5. Moreover, the speculation appears unlikely to become reality, as the JAMS Rules specifically provide: "Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final." JAMS Rule 11(a).

United States District Court
Northern District of California

in writing otherwise." ECF No. 6-1 at 4.

When faced with a petition or motion to compel arbitration brought in a district outside the contracted forum, some courts within this Circuit have compelled arbitration to occur within the district notwithstanding the contrary venue provisions in the parties' agreement. *E.g.*, *Seaman v. Priv. Placement Cap. Notes II, LLC*, No. 16-CV-00578-BAS-DHB, 2017 WL 1166336, at *6 (S.D. Cal. Mar. 29, 2017); *Homestake Lead Co. of Mo. v. Doe Run Res. Corp.*, 282 F. Supp. 2d 1131, 1143–44 (N.D. Cal. 2003). However, other courts have declined to do so. For example, in a case where the plaintiff filed suit in the Central District of California and the defendant brought a motion to compel arbitration under an agreement that selected Portland, Oregon, as the arbitral forum, the court explained that "[t]he Ninth Circuit has not addressed whether a district court can compel arbitration in its own district, contrary to the express terms of the parties' arbitration agreement, when the party seeking to compel arbitration did not initially file suit." *Puri v. Golden Temple of Or., LLC*, No. CV 10-882-JFW (VBKx), 2010 WL 11595757, at *1, *4 (C.D. Cal. June 9, 2010). The court explained that if it were to compel arbitration within its district, it "would run afoul of the [Federal Arbitration Act's] mandate that the Court direct the parties to proceed to arbitration 'in accordance with the terms of the agreement.'" *Id.* (quoting 9 U.S.C. § 4). Because the party seeking arbitration did not file the case—meaning that, like X Corp. here, it did not "invoke[] the jurisdiction of a court other than that having jurisdiction in [the arbitral forum specified in the agreement]," *Continental Grain*, 118 F.2d at 969—the court declined to compel arbitration in its district and instead dismissed the case. *Puri*, 2010 WL 11595757, at *4.

Similarly, another court "decline[d] to compel arbitration in the Central District of California" after "conclud[ing] that the arbitration provision must be given effect, and that St. Louis is the only proper venue for the arbitration." *Simplicity Int'l v. Genlabs Corp.*, No. CV 09-6146 SVW (RCx), 2010 WL 11507526, at *11 (C.D. Cal. May 6, 2010). The court concluded that it was bound by *Textile Unlimited*, but that the language of that case was permissive: "[W]hile the court *may* order arbitration in its own district, it need not do so." *Id.* at *11 (emphasis in original). The court denied the motion to compel arbitration but stayed the case "so that [the defendant] may file a petition to compel in St. Louis, Missouri." *Id.* at *12.

14

A third court, in the District of Arizona, also declined to compel arbitration in its district when the agreement called for arbitration to occur in elsewhere:

> As discussed above, the Court finds that the arbitration clause is valid, but it contracts for arbitration to occur in Utah, which is outside of this Court's jurisdiction. Because of this, the final issue is whether the Court can compel arbitration outside of its jurisdiction or alternatively compel arbitration in this district despite the forum selection clause. While there are some conflicting district court decisions, the majority agree that a district court is only able to compel arbitration in its own district.

> Accordingly, the Court finds that it cannot compel arbitration in the District of Utah. The Court also finds that compelling arbitration in the District of Arizona would be inappropriate because it would contradict what the Court finds to be a valid arbitration agreement wherein the parties selected Utah as the arbitration forum. "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration **in accordance with the terms of the agreement**." 9 U.S.C. § 4 (emphasis added). Therefore, the case will be stayed so that Defendant can pursue enforcement in the District of Utah.

*Hoyt v. WeLink Commc'ns, Inc.*, No. CV-23-00287-PHX-SMB, 2024 WL 169671, at *4 (D. Ariz. Jan. 16, 2024) (citations omitted).

The Court finds persuasive the reasoning in this latter set of cases. The parties' arbitration agreement, including its provisions regarding the location of the arbitration, must be given effect, but those provisions require arbitration to proceed outside of this district—a result that Ninth Circuit authority bars this Court from ordering. *Textile Unlimited*, 240 F.3d at 785. *Continental Grain*, which affirmed an order compelling arbitration outside the agreed arbitral forum, is distinguishable on its facts because, in that case, one party agreed to arbitration in the non-contracted forum, and the other party brought suit in that forum and therefore was "hardly in a position to complain" about the result. 118 F.2d at 969. Here, by contrast, X Corp. has consistently sought to uphold the parties' agreed forum and did not choose to file suit here. Under these circumstances, the Court does not find it appropriate to disregard the parties' agreement. Instead, the Court exercises its discretion to stay proceedings as to Ma and Treitler so that they may move to compel arbitration in a venue where "the terms of the agreement" can be enforced by compelling arbitration in the agreed forum. 9 U.S.C. § 4.

United States District Court
Northern District of California

### C.    Petitioners Amlani, Willis, and Olson

The Court next turns to the arbitration demands brought by Amlani, Willis, and Olson, who worked for Twitter in locations where JAMS does not have any providers who meet the requirements of Section 3 of the DRA.  That section provides that, unless the parties agree in writing otherwise, arbitration proceedings shall be held "no more than 45 miles from the place where the Employee reported to work for the Company," and "the Arbitrator shall be an attorney licensed to practice in the state in which the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the state where the arbitration will be conducted." ECF No. 6-1 at 4.  It is uncontested that the arbitration cannot both be conducted by JAMS, as required by Section 5 of the DRA, *id.*, and satisfy the licensing requirements of Section 3.

Petitioners argue that the Court should sever the licensing and location requirements and require arbitration either in the JAMS office nearest to Petitioners or in San Francisco.  However, they provide no argument as to why those provisions should be severed rather than the requirement that arbitration be conducted by JAMS.  In addition, the case law they cite refers to provisions in arbitration agreements that courts have found to be unconscionable, and Petitioners do not make an unconscionability argument here.  *See* ECF No. 26 at 19 (citing *Poublon v. C.H. Robinson Co.*, 847 F.3d 1251, 1273–74 (9th Cir. 2017); *Lang v. Skytap, Inc.*, 347 F. Supp. 3d 420, 432–33 (N.D. Cal. 2018); *Turng v. Guaranteed Rate, Inc.*, 371 F. Supp. 3d 610, 632 (N.D. Cal. 2018)).

Similarly, although X Corp. faults Petitioners for "never argu[ing] that the selection of JAMS is integral to the DRA," ECF No. 35 at 26, it presents no argument as to why the licensing and location provisions are integral either.  The company cites cases in which courts have appointed arbitrators not named in the relevant agreement when the named arbitrators were unavailable.  But in all of those cases, the arbitration provider either did not conduct arbitrations or declined to arbitrate the particular dispute at issue.  *E.g.*, *Khan v. Dell Inc.*, 669 F.3d 350, 352–53 (3d Cir. 2012) (designated provider was "barred from conducting consumer arbitrations by Consent Judgment, which resolved litigation brought by the Attorney General of Minnesota"); *Reddam v. KPMG LLP*, 457 F.3d 1054, 1057 (9th Cir. 2006) (designated provider "refused to take

16

jurisdiction over the arbitration"), *abrogated on other grounds by Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007); *Martin v. Certain Underwriters of Lloyd's, London*, No. 10-cv-1298, 2011 WL 13227729, at *2 (C.D. Cal. Sept. 2, 2011) (designated provider "does not conduct arbitration").  The situation in this case is different because JAMS appears able and willing to assign an arbitrator to hear the disputes brought by Amlani, Willis, and Olson.

Nonetheless, Section 3 of the DRA requires that arbitrators meet certain requirements, and that arbitration proceedings occur in certain locations, unless both parties agree not to enforce those provisions.  It allows JAMS to appoint an arbitrator under JAMS Rules "[i]f the parties fail to agree on an arbitrator within 30 days after the initiation of arbitration, *or at the request of either party*," ECF No. 6-1 at 4 (emphasis added), but the Court does not read this provision as allowing JAMS to appoint an arbitrator without regard to the licensing and location requirements.  If it were otherwise, any party could unilaterally request JAMS to select an arbitrator under its rules, which would necessarily result in an arbitrator who did not meet either requirement because JAMS lacks arbitrators who satisfy them.  This would render superfluous the agreement's requirement that the parties must agree to waive the licensing and location provisions, and the Court therefore rejects that interpretation.  *See, e.g.*, *Souza v. True N. Mgmt. Servs. LLC*, No. CV-23-02588-PHX-DWL, 2024 WL 2746967, at *3 (D. Ariz. May 29, 2024) (under Arizona contract law, courts "attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous" (citation omitted)).[3]

Because JAMS cannot assign any arbitrators that meet the requirements that X Corp. has refused to waive, the Court agrees with X Corp. that JAMS is unavailable to conduct the required arbitrations.  Petitioners make no argument that the identity of JAMS as the arbitration provider was so integral to the agreement that its unavailability renders the agreement unenforceable, and the Court does not so conclude.  However, the Court cannot grant the motion to compel arbitration under 9 U.S.C. § 4 because, as discussed above, it lacks authority to compel arbitration in the agreed venues for these three Petitioners.

---

[3] The Court cites Arizona law as an example because Amlani worked in Arizona.  Neither party suggests that the law in any state would require a different result.

United States District Court
Northern District of California

1    Although X Corp. argues that the Court has authority to appoint a substitute arbitrator

2  under 9 U.S.C. § 5, it did not file a motion seeking such relief, and the Court finds the parties'

3  arguments on this issue—including whether the Court has the authority to appoint a substitute

4  arbitrator outside of this district—to be under-developed.  Accordingly, the Court orders the

5  parties to meet and confer regarding how to proceed as to Amlani, Willis, and Olson.  Their

6  discussions shall include whether they can agree on arbitrators to conduct those proceedings; if

7  not, whether this Court has the authority to appoint arbitrators outside this district and, if so, how

8  the Court should choose whom to appoint; and whether the parties wish to stay this case as to

9  Amlani, Willis, and Olson so that they, like Ma and Treitler, can seek to enforce their arbitration

10  rights in a different venue.

**D.    Petitioner Crowley**

12    Finally, Petitioner Crowley requests that X Corp. be required to produce to his counsel a

13  copy of his signed arbitration agreement.  Petitioners assert that X Corp. has an obligation to

14  produce the agreement under California Labor Code Section 432, which states: "If an employee or

15  applicant signs any instrument relating to the obtaining or holding of employment, he shall be

16  given a copy of the instrument upon request."  But "the plain language of § 432 limits

17  applicability to 'employee[s] or applicant[s],' omitting any reference to former employees," such

18  as Crowley.  *Harris v. Best Buy Stores, L.P.*, No. 15-cv-00657-HSG, 2016 WL 4073327, at *10

19  (N.D. Cal. Aug. 1, 2016) (second alteration in original), *reconsideration granted on other

20  grounds*, 2016 WL 6248893 (N.D. Cal. Oct. 26, 2016).

21    X Corp. has not outright refused to provide a copy of the agreement to Petitioners' counsel,

22  but it has invoked California Labor Code Section 1198.5(e), which allows an employer to "take

23  reasonable steps to verify the identity of a current or former employee or his or her authorized

24  representative" before providing copies of personnel records.  Cal. Lab. Code § 1198.5(e).  The

25  statute further defines "representative" to mean "a person authorized in writing by the employee to

26  inspect, or receive a copy of, his or her personnel records."  *Id.*

27    Petitioners argue that counsel has initiated an arbitration proceeding before JAMS on

28  Crowley's behalf, ECF No. 6-5 at 28, and that they have also stated that they represent Crowley,

among others, in an email "request[ing] that Twitter provide a copy of each of these employees' signed Dispute Resolution Agreements, if they signed one (as well as a copy of any opt-out request from the agreement, if any of these employees opted out of the DRA)," ECF No. 36 at 24. However, both of these communications stop short of the statute's requirement that a representative be authorized in writing to receive copies of an employee's personnel records. While it would not seem burdensome for counsel to have provided such written authorization, they have not done so. Thus, X Corp. has the stronger argument regarding Section 1198.5(e), notwithstanding that there appears to be no reasonable dispute that Petitioners' counsel represent Crowley.

Petitioners also argue that Section 1198.5(e) does not apply to arbitration agreements because Section 1198.5 only gives "[e]very current and former employee, or his or her representative, . . . the right to inspect and receive a copy of the personnel records that the employer maintains *relating to the employee's performance or to any grievance concerning the employee*." Cal. Labor Code § 1198.5(a) (emphasis added). However, "case law indicates that § 1198.5 'intends a broad definition of "personnel file" to preclude employers from assigning documents to files having some other name, and then refusing access to the documents on the ground that they are not contained in the "personnel file."'" *Harper v. Charter Commc'ns, LLC*, No. 2:19-cv-00902 WBS DMC, 2021 WL 603724, at *19 (E.D. Cal. Feb. 16, 2021) (quoting *Wellpoint Health Networks, Inc. v. Super. Ct.*, 59 Cal. App. 4th 110, 124 (1997)).

But even if Petitioners are correct that Section 1198.5 does not apply to the DRA, that does not help their case because they have cited no other authority to support their request that the Court order X Corp. to provide a copy of Crowley's signed arbitration agreement to counsel. The Court will therefore not enter such an order.

However, Petitioners have requested a copy of the agreement not for its own sake, but because JAMS has refused to initiate Crowley's arbitration absent either a signed copy of the arbitration agreement or a court order. ECF No. 26-4 ¶¶ 3–4 (Crowley declaration explaining that he attached to his arbitration demand "an unsigned copy of what I believe to be my arbitration agreement" and stating that his "arbitration has not moved forward" because "JAMS has required

a signed copy of my arbitration agreement in order to administer my arbitration, and Twitter has not provided the signed copy"). Crowley believes he signed an arbitration agreement selecting JAMS as the arbitration provider, and Twitter acknowledged in its opposition brief that Crowley signed such an agreement. ECF No. 35 at 10 ("The version signed by Petitioner[] . . . Crowley . . . provide[s] for 'arbitration before Judicial Arbitration and Mediation Services ("JAMS"), pursuant to the then-current JAMS Rules.'"). Thus, both sides agree that Crowley signed an agreement to arbitrate with JAMS, and neither side argues that Crowley opted out of that agreement. Accordingly, the Court finds that Crowley is subject to an arbitration agreement and must arbitrate his claims through JAMS—or, in the words of 9 U.S.C. § 4, the Court is "satisfied that the making of the agreement for arbitration . . . is not in issue."

As with Ma and Treitler, however, Crowley also did not work for Twitter at a location within 45 miles of this district. Accordingly, for the reasons discussed above, the Court declines to grant Crowley's petition to compel arbitration because it cannot order arbitration in the parties' contracted forum. Instead, the Court stays the case as to Crowley so that he can seek an order compelling arbitration from the appropriate court.

## CONCLUSION

For the above reasons, Petitioners' motion to compel arbitration is denied. The Court concludes that arbitration should be compelled as to all remaining Petitioners. However, the Court will not enter an order compelling arbitration as to Ma, Crowley, and Treitler because 9 U.S.C. § 4 allows the Court to compel arbitration only in this district, which would be contrary to the parties' arbitration agreement. Instead, this case is stayed as to these three Petitioners so that they may pursue an order compelling arbitration in the appropriate venue.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The parties shall meet and confer to attempt to reach agreement on how to proceed as to Petitioners Amlani, Willis, and Olson.  They shall file a joint statement containing their joint or competing proposals no later than February 21, 2025.

**IT IS SO ORDERED.**

Dated:  February 7, 2025



_____
JON S. TIGAR
United States District Judge